STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, Plaintiff-Respondent,

v.

Nancy G. LANGRIDGE, Defendant-Appellant-
Petitioner.

Supreme Court

*No. 02–3353–FT. Oral argument February 12, 2004.—Decided
July 13, 2004.*

2004 WI 113

(Also reported in 683 N.W.2d 75.)

For the defendant-appellant-petitioner there were briefs by *Thomas M. Devine, JoAnne M. Breese-Jaeck, Christopher A. Geary* and *Hostak, Henzl & Bichler, S.C.,* Racine, and oral argument by *Thomas M. Devine.*

For the plaintiff-respondent there was a brief by *Russell M. Ware, Kenneth E. Rusch* and *O'Hagan, Smith & Amundsen, LLC,* Milwaukee and *Michael Resis* and *O'Hagan, Smith & Amundsen, LLC,* Chicago, IL, and oral argument by *Michael Resis.*

¶ 1. DAVID T. PROSSER, J. This case requires the court to determine underinsured motor vehicle (UIM) coverage in an automobile insurance policy. Nancy Langridge, an insured under the policy, seeks review of an unpublished decision of the court of appeals[1] affirming the circuit court's decision to grant summary judgment to the insurer. For the reasons explained below, we affirm.

---

[1] *State Farm Mut. Auto. Ins. Co. v. Langridge,* No. 02–3353–FT, unpublished order (Wis. Ct. App. June 4, 2003).

FACTS AND PROCEDURAL HISTORY

¶ 2. On June 19, 2000, William Langridge died in a traffic accident caused by a drunk driver. Langridge was the lone rider on a motorcycle that was covered under an automobile insurance policy that he and his wife Nancy had purchased from State Farm Mutual Automobile Insurance Company (State Farm). Both Mr. and Mrs. Langridge were named insureds. The State Farm policy included UIM coverage with limits of $100,000 per person and $300,000 per accident.

¶ 3. The drunk driver had liability coverage under a policy issued by Liberty Mutual Insurance Company. The drunk driver's policy had liability limits of $150,000. Following Mr. Langridge's death, Nancy Langridge—who was not present when the accident occurred—settled with Liberty Mutual for $150,000, while acting as representative of her husband's estate.

¶ 4. On June 7, 2001, Mrs. Langridge filed her own claim with State Farm for the $100,000 UIM coverage. State Farm denied her claim, explaining that she was not involved in the accident giving rise to the claim and had sustained no bodily injury; therefore, she was not entitled to coverage.

¶ 5. On April 25, 2002, State Farm initiated the present action, seeking a declaration that Mrs. Langridge is not entitled to recovery under the policy. Mrs. Langridge counterclaimed, alleging that she was covered by the UIM feature of the policy.[2] Before the counterclaim was filed, an arbitrator valued Mrs. Langridge's claim at $850,000. This dollar value consisted of $350,000 for the statutory cap on wrongful death damages for loss of society and companionship

_____

[2] Langridge also alleged that State Farm acted in bad faith by denying coverage.

41

and $500,000 to compensate for pecuniary loss resulting from her husband's death.

¶ 6. The parties traded motions for summary judgment. The Racine County Circuit Court, Charles H. Constantine, Judge, denied Mrs. Langridge's motion and awarded summary judgment to State Farm, concluding that Mrs. Langridge could not make her own claim under the policy because "the insured attempting to claim underinsured motorist coverage must have suffered a bodily injury." Under the facts presented, the court said William Langridge was the only insured to suffer a bodily injury:

> The insured suffering bodily injury (Mr. Langridge) in this case is not entitled to collect underinsured motorist coverage. The derivative claims would be compensable if there were a viable claim for bodily injury . . . As Mrs. Langridge did not [have bodily injury], there is no coverage.

¶ 7. Nancy Langridge appealed. The court of appeals affirmed the circuit court's judgment in favor of State Farm. According to the court of appeals,

> William Langridge suffered the bodily injury. [Mrs.] Langridge, therefore, recovers only as the survivor of her husband's claim. In other words, for the purposes of this insurance policy, her claim derives from her husband's claim for bodily injury. . . .
>
> Langridge argues that a wrongful death action is not a derivative action but is her own independent action. This is true in the sense that she may bring an independent cause of action for wrongful death. But we are not deciding whether a wrongful death action is an independent action. We are construing an insurance policy which provides that she must have sustained a bodily injury herself. In this sense, her action is deriva-

tive because under the policy, only those who have suffered bodily injury may recover. She has not, and consequently, is not entitled to recover.

We subsequently accepted Mrs. Langridge's petition for review.

## APPLICABLE POLICY PROVISIONS

¶ 8. The Langridge policy contains the following relevant provisions, some of which are defined terms that are used throughout the policy and which appear in bold face italics:

> *Bodily Injury*—means bodily injury to a *person* and sickness, disease or death which results from it.
>
> *Insured*—means the *person*, *persons* or organization defined as *insureds* in the specific coverage.
>
> *Person*—means a human being.
>
> . . . .
>
> **UNDERINSURED MOTOR VEHICLE— COVERAGE W**
>
> You have this coverage if "W" appears in the "Coverages" space on the declarations page.
>
> We will pay damages for *bodily injury* an *insured* is legally entitled to collect from the owner or driver of an *underinsured motor vehicle*. The *bodily injury* must be caused by accident arising out of the operation, maintenance or use of an *underinsured motor vehicle*.
>
> . . . .
>
> *Underinsured Motor Vehicle*—means a land motor vehicle.

43

1. the ownership, maintenance or use of which is insured or bonded for bodily injury liability at the time of the accident; and

2. whose limits of liability for bodily injury liability:

 a. are less than the limits of liability of this coverage; or

 b. have been reduced by payments to *persons* other than the *insured* to less than the limits of liability of this coverage.

. . . .

**Limits of Liability**

**Coverage W**

1. The amount of coverage is shown on the declarations page under "Limits of Liability-W-Each Person, Each Accident". Under "Each Person" is the amount of coverage for all damages due to *bodily injury* to one *person*. "*Bodily injury* to one *person*" includes all injury and damages to others resulting from this *bodily injury*. Under "Each Accident" is the total amount of coverage, subject to the amount shown under "Each Person", for all damages due to *bodily injury* to two or more *persons* in the same accident.

¶ 9. As noted above, the UIM limit in the Langridge policy for "Each Person" was $100,000. The UIM limit for "Each Accident" was $300,000. With these provisions at hand, we summarize each party's interpretation of the provisions as they apply to the facts underlying the claim.

¶ 10. Nancy Langridge asserts that her policy defines an "underinsured motor vehicle" to include a vehicle owned by an insured driver whose limits of

44

liability for bodily injury [$150,000] "b. have been reduced by payments to *persons* [William Langridge] other than the *insured* [Nancy Langridge] to less than the limits of the coverage." She argues that because she is a named insured under the policy, and the drunk driver's liability limits were paid to persons other than her, the insured drunk driver was underinsured as to her. Therefore, she asserts, she should be able to claim coverage under her policy for her wrongful death claim.

¶ 11. State Farm counters that Mrs. Langridge is attempting to split the claim for her husband's bodily injury into two claims to gain access to coverage to which she is not entitled. It asserts that since the drunk driver was not underinsured as to William Langridge and since Mrs. Langridge's claim under the policy is derivative of her husband's claim, the drunk driver was not underinsured. State Farm's position is that, based upon the context of the whole policy, the only relevant question to ask is whether the drunk driver was underinsured as to William Langridge. In its view, the answer is "no," and consequently there was no "underinsured motor vehicle" and no UIM coverage.

## STANDARDS OF REVIEW

¶ 12. In this case, the circuit court granted State Farm's motion for summary judgment. When we review a grant of summary judgment, our review is de novo. *Mullen v. Walczak,* 2003 WI 75, ¶ 11, 262 Wis. 2d 708, 664 N.W.2d 76 (citing *Ahrens v. Town of Fulton,* 2002 WI 29, ¶ 15, 251 Wis. 2d 135, 641 N.W.2d 423)); *Smith v. Katz,* 226 Wis. 2d 798, 805, 595 N.W.2d 345 (1999) (citing *Burkes v. Klauser,* 185 Wis. 2d 308, 327, 517 N.W.2d 503 (1994)). We rely upon the standard that summary judgment is granted when there is no genuine

issue of material fact, and the moving party is entitled to judgment as a matter of law. *Mullen,* 2003 WI 75, ¶ 11; *Smith,* 226 Wis. 2d at 805; *see also Taylor v. Greatway Ins. Co.,* 2001 WI 93, ¶ 9, 245 Wis. 2d 134, 628 N.W.2d 916. This is the same standard used by the circuit court and the court of appeals, and accordingly, we benefit from, but need not give deference to, the analyses of both courts. *Taylor,* 245 Wis. 2d 134, ¶ 9.

¶ 13. This case requires the court to interpret the terms of an insurance policy. The interpretation of an insurance policy is a question of law and is also reviewed de novo. *Folkman v. Quamme,* 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857 (citing *Danbeck v. Am. Fam. Mut. Ins. Co.,* 2001 WI 91, ¶ 10, 245 Wis. 2d 186, 629 N.W.2d 150); *Mullen,* 262 Wis. 2d 708, ¶ 12 (citing same). We construe insurance policies to give effect to the intent of the parties. *Folkman,* 264 Wis. 2d 617, ¶ 16 (citing *Sprangers v. Greatway Ins. Co.,* 182 Wis. 2d 521, 536, 514 N.W.2d 1 (1994)); *Mullen,* 262 Wis. 2d 708, ¶ 12.

¶ 14. To do so, we give the words in the insurance policy their common and ordinary meaning, that is, the meaning a reasonable person in the position of the insured would have understood the words to mean. *Folkman,* 264 Wis. 2d 617, ¶ 17 (citing Arnold P. Anderson, *Wisconsin Insurance Law* § 1.1(C) (4th ed. 1998)); *State Farm Mut. Auto. Ins. Co. v. Gillette,* 2002 WI 31, ¶ 28, 251 Wis. 2d 561, 641 N.W.2d 662 (citing *Danbeck,* 245 Wis. 2d 186, ¶ 10; *Maas v. Ziegler,* 172 Wis. 2d 70, 81–82, 492 N.W.2d 621 (1992); *Garriguenc v. Love,* 67 Wis. 2d 130, 134–35, 226 N.W.2d 414 (1975); *Henderson v. State Farm Mut. Auto. Ins. Co.,* 59 Wis. 2d 451, 459, 208 N.W.2d 423 (1973)).

¶ 15. If a policy is ambiguous as to coverage, it will be construed in favor of the insured. *Folkman,* 264 Wis. 2d 617, ¶ 16; *Gillette,* 251 Wis. 2d 561, ¶ 28. Thus, the first task in construing an insurance policy is to determine whether there is ambiguity with respect to the disputed coverage. *Badger Mut. Ins. Co. v. Schmitz,* 2002 WI 98, ¶ 51, 255 Wis. 2d 61, 647 N.W.2d 223. Language in an insurance policy is ambiguous "if it is susceptible to more than one *reasonable* interpretation." *Folkman,* 264 Wis. 2d 617, ¶ 13 (emphasis added); *see also Taylor,* 245 Wis. 2d 134, ¶ 10. Courts will interpret the words of an insurance contract against the insured when the insurer's interpretation conforms to what a reasonable person in the position of the insured would have understood the words to mean. *Folkman,* 264 Wis. 2d 617, ¶ 20 (citing *McPhee v. Am. Motorists Ins. Co.,* 57 Wis. 2d 669, 676, 205 N.W.2d 152 (1973)). We will not interpret a policy "to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium." *Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.,* 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 673 N.W.2d 65.

### ANALYSIS

A. Overview of UIM Coverage and "Underinsured Motor Vehicle"

¶ 16. In *Schmitz,* we noted two schools of thought concerning UIM coverage. 255 Wis. 2d 61, ¶ 17. Under the first view, UIM coverage operates as a separate fund to "compensate an insured accident victim when the insured's damages exceed the recovery from the at-fault driver (or other responsible party)." *Id.* (citing *Taylor,* 245 Wis. 2d 134, ¶ 32 (Bradley, J., dissenting); *Kaun v.*

*Indus. Fire & Cas.*, 148 Wis. 2d 662, 671, 436 N.W.2d 321 (1989)). If the policy at issue in this case were written to reflect this view, the Langridges' $100,000 per person UIM coverage would be available to compensate Nancy Langridge for a claim linked to her husband's wrongful death.

¶ 17. Under the second view, UIM coverage is designed "to put the insured in the same position as he [or she] would have occupied had the tortfeasor's liability limits been the same as the underinsured motorist limits purchased by the insured." *Schmitz*, 255 Wis. 2d 61, ¶ 18 (quoting *Dowhower v. W. Bend Mut. Ins. Co.,* 2000 WI 73, ¶ 18, 236 Wis. 2d 113, 613 N.W.2d 557). If the UIM policy at issue were drafted to conform to this view, the UIM coverage and the tortfeasor's liability policy conjunctively would offer a "predetermined, fixed level of insurance coverage" made up of payments from both policies. *Id.* (citing *Kaun*, 148 Wis. 2d at 674–75 (Steinmetz, J., dissenting)).

¶ 18. In recent years, the legislature has authorized policies embodying the latter view, and courts have recognized the legitimacy of these policies. *Dowhower,* 236 Wis. 2d 113, ¶ 33; *Taylor,* 245 Wis. 2d 134, ¶ 25; *Schmitz,* 255 Wis. 2d 61, ¶ 73. Yet, insurers need not draft, and consumers need not purchase, automobile insurance policies with this type of coverage. An insurer could offer coverage that embodies the first view of UIM insurance, and that insurer could and would charge a higher premium to account for the likelihood of larger and more frequent payments to insureds.

¶ 19. Defined terms play a large role in bounding the scope of a policy's coverage. Insurers may define "underinsured motor vehicle" to reflect either the first or second view of UIM coverage. As one treatise notes, "[p]olicies vary in their definitions of an underinsured

48

motor vehicle. The most crucial difference is whether the definition is based on the underinsured motorist motor vehicle policy limits or on the damages sustained by the insured." Arnold P. Anderson, *Wisconsin Insurance Law*, § 4.3(A) (4th ed. 1998). This difference is crucial because it significantly impacts the expectations of insureds.

¶ 20. When a UIM policy defines "underinsured motor vehicle" by comparing the insured's damages to the tortfeasor's liability coverage, an insured would expect the policy to conform to the first view of UIM coverage. That is, since the policy considers a vehicle "under"-insured when the tortfeasor's liability coverage is inadequate to fully compensate the insured, the insured could reasonably expect that the entire available limit of the policy would be available to cover part or all of the difference between the tortfeasor's liability limits and the insured's damages.

¶ 21. However, when a UIM policy defines an "underinsured motor vehicle" by comparing the tortfeasor's limits of liability to the insured's limits of UIM coverage, the insured ought reasonably to expect that the second, more common, view of UIM coverage is in effect. Specifically, an insured who reads the second definition in a policy ought reasonably to expect that the insurer promises only to insure for the difference between the insured's higher UIM limit and the tortfeasor's lower liability limit. An insured who enters into the second kind of UIM policy should not reasonably expect the policy to operate under the first view of UIM coverage.

B. The Issue of "Bodily Injury"

¶ 22. The issue in this case is whether Nancy Langridge is entitled to the UIM coverage of State

Farm's policy for her husband's death. Both lower courts concluded that she was not, and both based their decision in part on the rationale that Nancy Langridge must have suffered her own bodily injury to qualify for coverage.

¶ 23. This is not completely accurate. Nancy Langridge notes that the policy language does not include a prerequisite that an insured must have suffered bodily injury to recover. State Farm concedes as much in its brief:

> The defendant is correct to state in her brief ... that ... she is legally entitled to collect damages for her husband's death . . . .
>
> The defendant refers to a passage of the decision of the court of appeals in which [the court] observed that "under the policy, only those who have suffered bodily injury may recover." This language ... is an overstatement . . . . This language would be correct if it is amended so that the "bodily injury" must be caused by an "underinsured motor vehicle" as the policy requires.

¶ 24. The Langridges' policy had $100,000 per person UIM coverage. The drunk driver had $150,000 policy limits. If the drunk driver had had only $50,000 policy limits, Mrs. Langridge would have had a *derivative* claim for the $50,000 difference between the tortfeasor's policy limit and her $100,000 per person UIM coverage. If the Langridges' policy had had $300,000 per person UIM coverage, Mrs. Langridge would have had a *derivative* claim for the $150,000 difference between the tortfeasor's $150,000 policy limit and her $300,000 per person UIM coverage. Parenthetically, if the drunk driver had had no insurance at all, Mrs. Langridge would have had a *derivative* claim for the $100,000 uninsured motorist coverage of her

policy. In each of these instances, Mrs. Langridge did not have to suffer bodily injury herself in order to recover.

¶ 25. While State Farm concedes that Nancy Langridge need not have suffered a bodily injury to recover under every fact situation, it nonetheless asserts that she is not entitled to coverage in this fact situation, because she does not have a claim *under the policy* independent of her husband's bodily injury; she has only a derivative claim. State Farm's position is that the drunk driver's vehicle does not meet the definition of an "underinsured motor vehicle" as to William Langridge; consequently, it cannot meet the definition of an "underinsured motor vehicle" as to Mrs. Langridge because her claim derives from her husband's bodily injury. As a result, her claim falls outside the coverage provision of the policy.

C. The Issue of "Underinsured Motor Vehicle"

¶ 26. To state the obvious, underinsured motor vehicle coverage requires an "underinsured motor vehicle." Nancy Langridge argues that the drunk driver's vehicle meets the policy's "underinsured motor vehicle" definition as to her. Her reasoning is as follows.

¶ 27. First, Mrs. Langridge asserts that she is "an insured." The policy's coverage provision provides: "We will pay damages for **bodily injury** an **insured** is legally entitled to collect from the owner or driver of an **underinsured motor vehicle**. The **bodily injury** must be caused by accident arising out of the operation, maintenance or use of an **underinsured motor vehicle**." Nancy Langridge contends that she is "an **insured**" who is legally entitled to collect wrongful death

damages from the drunk driver for the death of her husband. She supports her position by referencing the policy's definition of bodily injury, which "means bodily injury to a ***person*** and sickness, disease or *death* which results from it." (Emphasis added). According to Mrs. Langridge, her wrongful death claim meets the requirements of the "for ***bodily injury***" clause of the coverage language because it is for the *death* of her husband which resulted from his bodily injury. State Farm does not dispute this reasoning. It is this reasoning that opens the door to a derivative claim.

¶ 28. Second, Mrs. Langridge asserts that the vehicle driven by the drunk driver meets the policy's definition of an "underinsured motor vehicle." She relies on paragraph "b" of the "underinsured motor vehicle" definition:

> ***Underinsured Motor Vehicle***—means a land motor vehicle.
>
> 1. the ownership, maintenance or use of which is insured or bonded for bodily injury liability at the time of the accident; and
>
> 2. whose limits of liability for bodily injury:
>
> a. are less than the limits of liability of this coverage; or
>
> b. *have been reduced by payments to **persons** other than the **insured** to less than the limits of liability of this coverage.* (Emphasis added).

¶ 29. Mrs. Langridge asserts that paragraph "b" renders the drunk driver's vehicle "underinsured" *as to her.* As she reads paragraph "b," she is "the ***insured***." The drunk driver's $150,000 limits of liability have been reduced by payments to her husband, not to her, and

therefore these payments have rendered the drunk driver's vehicle "underinsured" as to her.

¶ 30. State Farm reads the policy differently. Under the policy, a motor vehicle can be considered underinsured in either of two ways. First, paragraph "a" in the definition of "underinsured motor vehicle" speaks of a vehicle whose limits of liability "a. are less than the limits of liability of this coverage."

¶ 31. In this instance, the drunk driver purchased $50,000 *more* in liability coverage than the Langridges bought in UIM coverage. There is no dispute that the drunk driver's vehicle was *not* underinsured *as to William Langridge.*

¶ 32. State Farm emphasizes that Nancy Langridge's wrongful death claim for the death of her husband arises out of her husband's bodily injury and not her own, and therefore her claim is derivative. To underscore this point, State Farm relies on the limits of liability section of the policy. Under the "Limits of Liability" section, *"**Bodily injury** to one **person** in-*cludes *all* injury and *damages to others resulting from this **bodily injury**."*[3] (Emphasis added). State Farm asks that we read this provision in conjunction with *Gocha v. Shimon,* 215 Wis. 2d 586, 573 N.W.2d 218 (Ct. App. 1997), and *Richie v. American Family Mutual Insurance Company,* 140 Wis. 2d 51, 409 N.W.2d 146 (Ct. App. 1987).

---

[3] This provision is similar to the clause American Family Mutual Insurance Company relied on in *Mullen v. Walczak,* 2003 WI 75, ¶ 4, 262 Wis. 2d 708, 664 N.W.2d 76. Their "limits of liability" for uninsured motorist coverage provided that the "limit for 'each person' is the maximum for all damages sustained by all persons as the result of *bodily injury* to one person in any one accident."

¶ 33. Both *Gocha* and *Richie* involved fact situations in which insureds were not entitled to collect the greater "per accident" limit; they were confined to the smaller "per person" limit because there was only one insured who suffered a bodily injury. These cases distinguish between independent claims and derivative claims. Both conclude that when an insured seeks payment arising out of the bodily injury of another, the insured's claims are "derivative" of the claim of the person suffering the bodily injury,[4] and as a result only the "per person" limit is available for each person suffering bodily injury.

¶ 34. Turning to paragraph "b," State Farm explains that paragraph "b" is designed to address situations in which multiple parties suffer bodily injury in one accident, and the tortfeasor's automobile liability insurance is exhausted by payments to a person or persons other than the State Farm policy's "insured" claimant. These other persons might be in other vehicles, or they might be in the same vehicle as the insured. Payments from the tortfeasor's policy for bodily injury to other persons can reduce the tortfeasor's liability limits that are available to the insured.

¶ 35. Typically, if a policy defines "underinsured motor vehicle" as it did here—by comparing the tortfeasor's liability limits to the limits of UIM coverage —then "payment to other injured parties that reduces the coverage available to an insured below UIM limits *will usually not trigger UIM coverage.*" Anderson, *supra,* § 4.3(E) (emphasis added). Thus, paragraph "b" goes beyond typical coverage to provide coverage for an

---

[4] This principle was reaffirmed last term under different circumstances in *Mullen,* 262 Wis. 2d 708.

insured when a tortfeasor becomes functionally under-insured by virtue of payments to others, in that the tortfeasor's remaining coverage to compensate the insured is less than the insured's own UIM limits.

¶ 36. This concept meshes with language in the "Limits of Liability" section:

> The amount of coverage is shown on the declarations page under "Limits of Liability—W—Each Person, Each Accident". . . . *Under "Each Accident" is the total amount of coverage,* subject to the amount shown under "Each Person", *for all damages due to **bodily injury** to two or more **persons** in the same accident.* (Emphasis added).

## D. Interpreting the Policy

### 1. Identifying "the Insured" in Paragraph "b"

¶ 37. In our view, the outcome of this case turns on whether "the insured" in paragraph "b" could reasonably refer to Nancy Langridge. We conclude that it is not reasonable to read the policy in this fashion. As a result, the policy is not ambiguous and should not be construed in favor of the insured.

¶ 38. We observe, first, that if paragraph "b" referred to a motor vehicle whose limits of liability for bodily injury liability "have been reduced by payments to *persons* other than *AN* insured," instead of "THE insured," there would be no issue, because "AN insured" would include William Langridge. In fact, some policies do use "an insured" in a similar context.[5] Yet, there would be situations in which use of the phrase "an

---

[5] *See, e.g., State Farm Mut. Auto. Ins. Co. v. Villicana,* 692 N.E.2d 1196, 1198 (Ill. 1998); *Kraly v. Vannewkirk,* 635 N.E.2d

insured" would limit payment to surviving "insureds" who had actually suffered bodily injury, and that result would conflict with the reasonable expectations of the insured.[6]

¶ 39. We observe, second, that if Mrs. Langridge were *not* a named insured, she could make a claim representing the estate under paragraph "a" in a situation where her husband's policy limits made him eligible for UIM coverage. As a named insured, she could make a claim under paragraph "a" in a situation where her husband's policy limits made him eligible for UIM coverage. In both situations, the drunk driver's vehicle would be an "underinsured motor vehicle." Instead, Mrs. Langridge seeks to collect under paragraph "b" because her husband's policy limits did not make him eligible for underinsured motorist coverage.

¶ 40. We are required to ask how an insured who cannot succeed under paragraph "a" with a traditional derivative claim can expect to succeed under paragraph "b" with an independent claim when the insured claimant has not suffered bodily injury herself and when she is wholly dependent in her claim upon the bodily injury of another. How can she expect an interpretation of the

---

323, 325 (Ohio 1994); *Pitchford v. State Farm Mut. Auto. Ins. Co.,* 934 P.2d 616, 618 (Or. Ct. App. 1997).

[6] Contrary to the dissent's assertion that ¶¶ 38–40 of this opinion constitutes our "essential analysis," we note that these paragraphs simply serve to focus the discussion within the appropriate analytical framework. Given the complex nature of UIM cases, guiding the reader through the intricacies of UIM coverage facilitates reader understanding. We direct the reader to Section D.2 of this opinion, especially ¶¶ 51–55, wherein we explain why Nancy Langridge's interpretation of the definition of "Underinsured Motor Vehicle" is unreasonable, therefore rendering the policy unambiguous with respect to the issues presented in this case.

policy that an insured who suffers no bodily injury has an independent claim equal to the claim of a surviving insured who actually suffers bodily injury?

2. The Relationship Between Ambiguity and the Reasonable Expectations of the Insured

¶ 41. Our first task when interpreting an insurance policy is to determine whether the policy is ambiguous. It is important to recognize that simply because the parties offer two different interpretations of paragraph "b" does not mean both interpretations are reasonable. *See Ruff v. Graziano,* 220 Wis. 2d 513, 524, 583 N.W.2d 185 (Ct. App. 1998) (citing *Sprangers v. Greatway Ins. Co.,* 182 Wis. 2d 521, 537, 514 N.W.2d 1 (1994)). "The mere fact that a word has more than one dictionary meaning, or that the parties disagree about the meaning, does not necessarily make the word ambiguous if the court concludes that *only one meaning applies in the context and comports with the parties' objectively reasonable expectations.*" *Id.* (quoting *Sprangers,* 182 Wis. 2d at 537) (emphasis added).

¶ 42. Judicial construction of insurance policies is both similar to and different from judicial construction of contracts. In general, "[w]e apply the same rules of construction to the language in insurance policies as to the language in any other contract." *Taylor,* 245 Wis. 2d 134, ¶ 10 (citing *Kremers-Urban Co. v. Am. Employers Ins. Co.,* 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984)). In both arenas, our goal is to give effect to the intent of the parties. *Folkman,* 264 Wis. 2d 617, ¶ 16.

¶ 43. Setting to one side the specific interpretive principles that apply to insurance policies, we note that courts have several means to address ambiguous contract language. For instance, a court faced with an ambiguous contract will "select that construction which gives effect to each word or provision of the contract in preference to a construction which results in surplusage." *Jones v. Jenkins*, 88 Wis. 2d 712, 722, 277 N.W.2d 815 (1979). The court will also adopt a construction that "will result in a reasonable, fair and just contract as opposed to one that is unusual or extraordinary." *Id.* Often the court will "look to the purpose of the contract and the circumstances surrounding its execution to determine the intent." *Id.* at 723.

¶ 44. These principles are buttressed by the judicial maxim that "[a]mbiguous wording will be construed against the drafter *provided the contract is also construed as a whole.*" *Id.* at 722 (emphasis added). This principle, which in the archaic parlance of the common law was known as *contra proferentem* ("against the offeror"), may be the transcendent principle for resolving ambiguous language in insurance policies. If an insurance policy is ambiguous, then the policy is to be interpreted against the drafter. *See Donaldson v. Urban Land Interests, Inc.,* 211 Wis. 2d 224, 230, 564 N.W.2d 728 (1997).

¶ 45. A court that reviews a contract that is not an insurance policy has some latitude to deem an interpretation plausible and therefore reasonable because the court is specifically empowered to consider

the consequences of the interpretation in determining which competing interpretation should govern. As this court once put it:

> the court may look to the consequences which could result should it adopt one construction as opposed to another, because where there is ambiguity the more reasonable meaning should be given on the probability that persons situated as the parties were would be expected to contract in that way as opposed to a way which works an unreasonable result.

*Lee v. Wis. Physicians Serv.,* 76 Wis. 2d 353, 359, 252 N.W.2d 24 (1977).

¶ 46. If a court deems an insurance policy ambiguous, however, the court is quite constrained in its resolution under the principles of *contra proferentem.* This cannot and does not mean, however, that a court must embrace *any* grammatically plausible interpretation that an insured might create for the purposes of litigation without regard to whether the consequences of that interpretation square with the reasonable expectations of insureds.

¶ 47. A court must be careful not to lose sight of the goal of judicial construction, which is to advance the reasonable expectations of the parties. Courts dealing with insurance policies must give especially keen attention to the expectations of insureds, so long as they do not abandon reasonableness in the process. Even the doctrine of *contra proferentem* incorporates the notion that "the policy's terms should be interpreted *as they would be understood from the perspective of a reasonable person in the position of the insured,"* Donaldson,

211 Wis. 2d at 230, not simply adhere to any interpretation that is grammatically plausible and creates coverage for insureds.

¶ 48. If an insured advances a grammatically plausible interpretation, but that interpretation does not square with what the insured would have understood the policy to mean absent a monetary incentive, then that reading should be rejected as unreasonable. The tenets of insurance policy construction provide that there is ambiguity where a policy is susceptible to more than one *reasonable* interpretation. *Folkman,* 264 Wis. 2d 617, ¶ 13; *Danbeck,* 245 Wis. 2d 186, ¶ 10.

¶ 49. We look then at the reasonable expectations of the insured here. The primary definition of "underinsured motor vehicle" in this policy conveys to the insured that this policy follows the second view of UIM coverage. This policy is *not* the type that defines "underinsured motor vehicle" by comparing the insured's total damages to the tortfeasor's limits of liability. When, as here, a UIM policy defines "underinsured motor vehicle" with reference to the tortfeasor's limits of liability and the limits of UIM coverage, a reasonable insured should expect that UIM coverage to put the insured in the same position the insured would have occupied had the tortfeasor's liability limits been the same as the UIM limits.

¶ 50. In this instance, the drunk driver purchased $50,000 *more* in liability coverage than the Langridges purchased in UIM coverage. Thus, Nancy Langridge skips over paragraph "a" to paragraph "b." Reasonable insureds should expect paragraph "b" to apply where multiple parties suffered bodily injury in the accident

60

and the tortfeasor's limits of liability have been reduced or exhausted in payment to others suffering bodily injury.

¶ 51. In this case, an insured who suffered no bodily injury seeks to recover for her spouse's wrongful death after the tortfeasor's "limits of liability for bodily injury" had been fully paid. If we were to accept Nancy Langridge's reading of the policy, then every time a wife and husband were both insured under the same UIM coverage, the surviving spouse would always be able to assert per person UIM coverage *unless* the tortfeasor's policy limits exceeded the amount paid to the estate. To illustrate, if the drunk driver who killed Nancy Langridge's husband had $500,000 per person liability limits, and that entire amount was paid to William Langridge's estate, Nancy Langridge would be able to make the same argument she is making now. Payment to an estate[7] would never eliminate a wrongful death claim under paragraph "b" unless the tortfeasor did not pay out its limits of liability and had, say, $100,000 left. Mrs. Langridge's reading of the policy essentially transforms UIM into a form of life insurance for a spouse killed in an automobile accident. This is not consistent with a reasonable insured's understanding of the UIM policy.

¶ 52. Another way of saying this is that a tortfeasor's motor vehicle would likely be transformed into an "underinsured motor vehicle" whenever another

---

[7] A wrongful death claim belongs to the surviving spouse, not the deceased's estate. *See Miller v. Luther,* 170 Wis. 2d 429, 436, 489 N.W.2d 651 (Ct. App. 1992). "The action for wrongful death does not belong to the estate of the deceased." *Weiss v. Regent Props. Ltd.,* 118 Wis. 2d 225, 230, 346 N.W.2d 766 (1984) (quoting *Nichols v. United States Fid. and Guar. Co.,* 13 Wis. 2d 491, 496, 109 N.W.2d 131 (1961)).

insured had a wrongful death claim. This would un-tether the definition of "underinsured motor vehicle" from the concept it was intended to define. It would transform a policy embodying the second view of UIM coverage into a policy delivering the first view of UIM coverage. *See* ¶¶ 16, 17, *supra.* A reasonable insured would not expect that the definition of "underinsured motor vehicle" would shift so dramatically from one paragraph to another.

¶ 53. In contrast, State Farm's reading of the policy—that "the insured" here must mean William Langridge, "the insured" who suffered the bodily injury—is contextually harmonious with the rest of the policy. If (1) persons other than William Langridge suffered bodily injury; (2) received payment from the tortfeasor's liability insurer; and (3) thereby reduced that policy's limits of liability such that the tortfeasor's limits of liability provided less coverage for an insured than the UIM policy, then the tortfeasor's vehicle would be "underinsured." A rational consumer who purchases this coverage would not expect that the policy would provide an independent fund for wrongful death irre-spective of the amount of coverage a tortfeasor has purchased, e.g., the first view of UIM coverage.

¶ 54. Accordingly, we conclude that there is only one reasonable reading of paragraph "b." When this policy references payments to persons other than "the insured," "the insured" can only reasonably refer to William Langridge. The Langridge policy is not ambigu-ous because the disputed provision is susceptible to only one reasonable interpretation.

¶ 55. To sum up, when we analyze the drunk driver's vehicle on the facts before us, we conclude that it was not an "underinsured motor vehicle." The drunk driver's vehicle had a per person liability limit greater

than the per person UIM limit in the Langridge policy and the drunk driver's per person limit of liability was completely paid out to the only "insured" who had an independent claim for bodily injury, William Langridge. Under the policy, Mrs. Langridge had a derivative claim for her husband's bodily injury. She had a right to pursue that derivative claim whether or not *she* suffered bodily injury, but only until the tortfeasor's per person limit of liability was exhausted. She did not have her own independent claim *under the policy*. Her interpretation of paragraph "b" to the contrary is unreasonable and in conflict with the expectation of a reasonable insured. Because the drunk driver's vehicle was not an "underinsured motor vehicle," the Langridge policy provided no UIM coverage. Accordingly, the decision of the court of appeals is affirmed.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 56. DIANE S. SYKES, J., did not participate.

¶ 57. ANN WALSH BRADLEY, J. (*dissenting*). The majority concludes that the policy unambiguously provides no coverage to Nancy Langridge for her wrongful death claim. Its essential analysis for this conclusion is limited to only three paragraphs sandwiched in the middle of the opinion. Because I believe that the three paragraphs of analysis do not support the majority's conclusion and that any ambiguity should be construed against State Farm, I respectfully dissent.

¶ 58. Initially, the focus of this case was whether Langridge had to sustain bodily injury in order to collect on her claim.[1] State Farm denied Langridge's claim on the basis that she "was not involved in the

---

[1] The language then at issue provided in relevant part:

accident." When asked to clarify, State Farm explained that Langridge was not entitled to coverage under the policy because she "did not sustain her own bodily injuries in the accident."

¶ 59. The circuit court awarded summary judgment to State Farm, subscribing to its then unambiguous interpretation of the policy. It determined that Langridge could not collect on her claim because "the insured attempting to claim underinsured motorist coverage must have suffered a bodily injury."

¶ 60. The court of appeals affirmed the judgment of the circuit court. It too concluded that Langridge "must have sustained a bodily injury herself . . . because under the policy only those who suffered bodily injury may recover." *State Farm Mut. Auto. Ins. Co. v. Langridge,* No. 02–3353–FT, unpublished order at 3 (Wis. Ct. App. June 4, 2003).

¶ 61. Now State Farm changes its course. Although successful at both the circuit court and court of appeals, it now concedes that the language of the policy should be interpreted to provide that Langridge did not have to suffer bodily injury in order to recover under the policy. Indeed, in this court, State Farm advances a different argument altogether, maintaining that Langridge cannot collect on her claim because the definition of an underinsured motor vehicle is not met.

UNDERINSURED MOTOR VEHICLE – COVERAGE W

**You** have this coverage if "W" appears in the "Coverages" space on the declarations page.

We will pay damages for **bodily injury** an **insured** is legally entitled to collect from the owner or driver of an **underinsured motor vehicle**. The **bodily injury** must be caused by accident arising out of the operation, maintenance or use of an **underinsured motor vehicle.**

64

¶ 62. The provision in dispute is paragraph "b" of the "underinsured motor vehicle" definition. That definition provides in relevant part:

**Underinsured Motor Vehicle** — means a land motor vehicle. . . .

2. whose limits of liability for bodily injury liability:

a. are less than the limits of liability of this coverage; or

b. *have been reduced by payments to* **persons** *other than the* **insured** *to less than the limits of liability of this coverage.*

(Emphasis added).

¶ 63. Langridge maintains that the vehicle driven by the drunk driver meets the policy's definition of an "underinsured motor vehicle." Specifically, she asserts that paragraph "b" of the definition renders the drunk driver's vehicle "underinsured" as to her. Langridge notes that she is "insured" under the policy and that the drunk driver's liability limits were paid to persons other than her, namely her husband.

¶ 64. State Farm contends that Langridge is attempting to split her husband's bodily injury claim into two in order to obtain coverage under the policy. Although it acknowledges that Langridge could qualify as "the insured" under the plain language of paragraph "b," it argues that the provision must be read in context of the whole policy. Based upon such context, State Farm submits that the only relevant question is whether the drunk driver was underinsured as to Langridge's husband. Because he was not, it reasons, the drunk driver cannot be underinsured as to Langridge.

¶ 65. In concluding that the disputed language of the policy is unambiguous and that it precludes recovery for Langridge, the majority engages in substantial

extraneous discussion. From the sheer volume of discussion, a red flag arises, suggesting that if it takes that much discussion to conclude that a single sentence in a policy is clear and unambiguous, something is suspect.

¶ 66. The analysis of the majority is suspect with good cause. Although it maintains that the language is "not ambiguous," the majority engages in a lengthy discussion, describing what a court does if the language is deemed ambiguous. Majority op., ¶¶ 43–46. This discussion serves to mask the inadequate reasoning of its conclusion.

¶ 67. At this point, it may be best for the reader to turn back to the three paragraphs of analysis which underpin the majority's conclusion. These paragraphs, 38, 39, and 40, comprise the total analysis set forth in Section D.1, which interprets the pivotal policy provision at issue in this case. According to the majority, "the outcome of this case turns on whether 'the insured' in paragraph 'b' could reasonably refer to Nancy Langridge." *Id.*, ¶ 37.

¶ 68. In paragraph 38, the majority observes that if paragraph "b" had referred to "AN insured" instead of "THE insured," there would be no issue in this case. Although this is true, it is completely beside the point. The language of paragraph "b" is "the insured." While State Farm could have very easily drafted its policy language differently so as to preclude Langridge's claim (e.g., requiring that an insured suffer his or her own bodily injury in order to recover), it chose not to do so.

¶ 69. In paragraph 39, the majority notes that if Langridge were not a named insured, she could make a claim representing the estate under paragraph "a." Again, this analysis misses the mark. All agree that Langridge is a named insured. Her claim of wrongful death is independent of her husband's estate. Thus, the

only relevant inquiry is whether the plain language of paragraph "b" renders the drunk driver's vehicle under-insured as to her.

¶ 70. Finally, in paragraph 40, the majority asks, "[H]ow can [Langridge] expect an interpretation of the policy that an insured who suffers no bodily injury has an independent claim equal to the claim of a surviving insured who actually suffers bodily injury?" This question, of course, echoes the earlier misinterpretations of the circuit court and court of appeals. State Farm has now abandoned the position that bodily injury is required to state a claim; the majority should do the same.

¶ 71. On its face, State Farm's policy appears to provide coverage for Langridge's wrongful death claim. There is no dispute that she is "insured" under the policy. Rather, the dispute centers on whether Langridge can meet the definition of underinsured motor vehicle under paragraph "b." That paragraph refers to a land motor vehicle whose limits of liability for bodily injury "have been reduced by payments to **persons** other than the **insured** to less than the limits of liability of this coverage."

¶ 72. Here, Langridge is "the insured." The limits of liability for bodily injury have been reduced by payments to persons other than Langridge, that is, by payments to her husband for his conscious pain and suffering. Additionally, the limits of liability of the drunk driver have been reduced to less than the limits of liability of the coverage. The policy limits of the drunk driver were exhausted via the payment to Langridge's husband.

¶ 73. I believe that the more reasonable interpretation of the language of paragraph "b" is as stated above. Even if, as State Farm asserts, it is reasonable to interpret "the insured" in paragraph "b" as referring to

Langridge's husband rather than to Langridge, then we are left with two reasonable interpretations of this policy language. Words or phrases of an insurance policy are ambiguous if they are susceptible to more than one reasonable construction. *Badger Mut. Ins. Co. v. Schmitz,* 2002 WI 98, ¶ 51, 255 Wis. 2d 61, 647 N.W.2d 223. If the policy language is ambiguous, we construe it against the drafter. *Id.* I therefore conclude that Langridge is entitled to coverage under our traditional canons of construction.

¶ 74. In sum, the majority once again invokes the mantra of unambiguous policy language to defeat an insured's reasonable expectation of recovery. Its decision to do so boils down to three paragraphs of weak and unsupportable analysis. I determine that the policy provision at issue is ambiguous and should be construed against State Farm. Accordingly, I respectfully dissent.

¶ 75. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON, joins this dissent.