724 N.W.2d 243 (2006)
2006 WI App 207
Hjalmer C. HEIKKINEN, Amelia Heikkinen, State of Wisconsin Department of Health and Family Services and Tommy G. Thompson, Secretary, Department of Health and Human Services, Plaintiffs-Respondents,
v.
UNITED SERVICES AUTOMOBILE ASSOCIATION and Margaret E. Morse, Defendants-Third-Party Plaintiffs-Respondents,
The Catholic Mutual Relief Society of America[] and Archdiocese of Milwaukee, Defendants-Third-Party Defendants-Appellants.
No. 2005AP1638.
Court of Appeals of Wisconsin.
Submitted on Briefs August 1, 2006.
Opinion Filed September 6, 2006.
*245 On behalf of the defendants-third-party defendants-appellants, the cause was submitted on the briefs of Frank L. Steeves and O. Thomas Armstrong of Von Briesen & Roper, S.C., of Milwaukee.
A nonparty brief was filed by Philip K. Howard of Covington & Burling of New York, New York, Attorneys for Non-Party Common Good Institute, Inc., and Michael B. Apfeld of Godfrey & Kahn, S.C., of Milwaukee, in support of defendants-third-party defendants-appellants.
On behalf of the plaintiffs-respondents, the cause was submitted on the brief of Don C. Prachthauser and Kevin J. Kukor of Murphy & Prachthauser and Kevin J. Kukor of Murphy & Prachthauser of Milwaukee.
On behalf of the defendants-third-party plaintiffs-respondents, the cause was submitted on the brief of Terry E. Johnson and Frederick J. Smith of Peterson, Johnson & Murray, S.C., of Milwaukee.
Before FINE, CURLEY and KESSLER, JJ.
¶ 1 CURLEY, J.
Catholic Mutual Relief Society of America and the Archdiocese of Milwaukee (collectively, Catholic Mutual), third-party defendants-appellants, appeal from the judgment entered against them after a jury found that defendant-third-party plaintiff-respondent Margaret Morse had *246 coverage under Catholic Mutual's self-insurance certificate. This case arose out of a personal injury action where Morse's negligence was the cause of an automobile accident that injured plaintiff-respondent Hjalmer Heikkinen.
¶ 2 Catholic Mutual asserts that: (1) the trial court erred in refusing to bifurcate coverage issues from damage issues; (2) the trial court erred in formulating the special verdict question such that Morse would be covered by Section II-D of the insurance certificate, if she was driving her automobile "on behalf of" Christ King Parish (Christ King) or the Archdiocese, and even if the question was properly formulated, there was insufficient evidence to conclude that Morse was acting "on behalf of" Christ King or the Archdiocese; (3) Morse had no coverage under Section VII of the certificate; and (4) damages were excessive.
¶ 3 We conclude that: (1) the trial court did not err in refusing to bifurcate the trial; (2) the trial court properly formulated the special verdict to determine coverage and that sufficient evidence existed for the jury to find that Morse was covered; (3) Morse is covered by Section VII of the certificate; and (4) the damages were not excessive. Accordingly, we affirm.[1]

I. BACKGROUND.
¶ 4 On March 25, 2002, Morse ran a red light and collided with a vehicle driven by Heikkinen. The accident severely injured the then eighty-two-year-old Heikkinen, necessitating the amputation of one of his legs and causing him to lose bladder and bowel functions. Morse's negligence and causation are not in dispute.
¶ 5 Morse was a member of Christ King Parish (Christ King), a church within the Milwaukee Archdiocese. She was also a volunteer for the Christ King Legion of Mary (Legion of Mary), a volunteer service organization consisting of members of Christ King. An activity of the Legion of Mary is the delivery of statues of the Virgin Mary, that have been blessed by a parish priest, to parishioners who request them. At the time of the accident, Morse was in the process of delivering a statue to a family that had requested one. She was driving her own car.
¶ 6 The main issue in this case is whether Morse is covered by a liability insurance certificate (the certificate) issued by Catholic Mutual to the Archdiocese. The certificate first provides, in a section entitled "Who is a protected person(s) under this certificate":
The term "you" or "your" in this certificate means:
Jointly the Certificate Holder and all educational, charitable and religious institutions, whether separately incorporated or not, listed on the ledger pages of the certificate, and listed in or eligible to be listed in the Official Catholic Directory.
The Certificate Holder is the Archdiocese. Christ King is listed on the ledger pages of the certificate and in the Official Catholic *247 Directory and is thus indisputably covered. The Legion of Mary is listed neither on the ledger pages of the certificate nor in the Official Catholic Directory.
¶ 7 The certificate also specifies that, as "protected person(s)" "[w]ith respect to Sections II, V & VII" of the certificate:
1. This Certificate also covers the Ordinary; his successor in office; any officer, board member, employee, volunteer, servant and/or agent individually and/or collectively of a Protected Person(s) while acting within the scope of their duties or in their official capacity as such.
¶ 8 In addition, two other sections are relevant to this appeal: Section II, "General Liability," which provides coverage for up to $500,000; and Section VII, "Excess Liability Umbrella," which provides coverage for up to $40,000,000.
¶ 9 Section II provides in relevant part:
We shall pay on your behalf, up to the Limit of Liability shown in the Declarations, all sums which you may become legally obligated to pay as damages arising out of an occurrence during the Certificate Period resulting in:
1. Bodily Injury, Personal Injury (including Corporal Punishment)
2. Advertising Injury
3. Property Damage
We shall pay up to the Limit of Liability for any one occurrence to which this coverage applies.
¶ 10 The certificate also contains an "automobile exclusion," as well as an exception to this exclusion:
We do not cover Bodily Injury or Property Damage:
1. Resulting from the ownership, operation, maintenance, use, loading or unloading of:
(a) any automobile owned, operated by, rented or loaned to any Protected Person(s) or organization included under "Who is a Protected Person(s) Under This Certificate." This Exclusion does not apply to Religious, Volunteers and Employees, while using their own automobiles on behalf of the Certificate Holder or other Protected Person(s), except this coverage is excess over the Religious, Volunteers and Employees own coverage . . .
¶ 11 The other relevant provision, Section VII, provides as relevant:
Except as may be otherwise stated herein, and except with respect to (1) any obligation to investigate or defend any claim or suit, or (2) any obligation to renew, the coverage afforded by this form shall follow the terms and conditions of the underlying coverage as shown. The coverage provided by this form shall apply only as excess of and after all underlying coverage has been exhausted by the payment of loss.
¶ 12 On February 7, 2003, Heikkinen and his wife Amelia Heikkinen filed suit against Morse and her automobile insurer, United Services Automobile Association (USAA), through which Morse had a liability insurance policy with coverage for up to $50,000. On January 5, 2004, Morse and USAA (collectively, Morse) filed a third-party action against Catholic Mutual seeking coverage under the certificate by alleging that "at the time of the accident . . . Morse was a religious volunteer using her own automobile on behalf of the Archdiocese and other protected persons. . . ."
¶ 13 Catholic Mutual responded by denying that the certificate provided coverage for Morse, arguing that the exception to the automobile exclusion does not create coverage. Catholic Mutual also sought to bifurcate the trial under WIS. STAT. *248 § 803.04(2)(b) (2003-04)[2] to resolve the coverage and damage issues separately. Morse and the Heikkinens opposed the motion, arguing that because § 803.04(2)(b) allows bifurcation only when an "insurance policy" is involved and this situation did not involve an "insurance policy," bifurcation was not allowed under the statute. The trial court denied the bifurcation request on the grounds that bifurcation would unnecessarily delay the proceedings involving the then eighty-four-year-old Heikkinen, who was in fragile health, and that § 803.04(2)(b) did not apply to third parties.
¶ 14 Catholic Mutual moved for summary judgment, contending that Morse could be covered by the certificate only if she was acting as an agent for Christ King or the Archdiocese, and asserting that she was not. Morse and the Heikkinens argued that Morse's claim was based on her acting "on behalf of" a protected person, not agency, and moved for summary judgment, or, in the alternative, for the court to rule as a matter of law that Morse was covered by the certificate. The trial court denied both motions for summary judgment and the request to declare coverage. Catholic Mutual renewed its request for bifurcation, and the court again denied it.
¶ 15 Prior to trial, the Archdiocese and Catholic Mutual asked the court to determine the special verdict questions before the close of evidence, proposing that the jury be instructed as to "agency" and "volunteer-agency," WIS JICIVIL 4000 and 4025. The court refused to do so. The jury trial began on February 14, 2005. The jury heard testimony about the Legion of Mary, Christ King, the Archdiocese, and the relationship between the three, as well as testimony concerning the accident and Heikkinen's injuries.
¶ 16 At the close of evidence, Catholic Mutual objected to a special verdict question asking whether Morse was driving her automobile "on behalf of" Christ King and/or the Archdiocese, and again asked that the jury be instructed as to "agency" and "volunteer-agency." The court denied the request and specifically declined to instruct the jury on the law of agency. At the end of the trial, Catholic Mutual proposed the following instruction: "At the time of the accident, was Margaret Morse acting within the scope of her duties or official capacity as a volunteer of Christ King Parish or the Archdiocese of Milwaukee?" The question ultimately read: "At the time of the collision, was Margaret Morse driving her automobile on behalf of Christ King Parish and/or the Milwaukee Archdiocese?"
¶ 17 The jury found that Morse's negligence was the sole cause of the accident, and that Morse was "driving her automobile on behalf of Christ King Parish and/or the Milwaukee Archdiocese." The jury awarded Heikkinen $558,366.06 for past medical expenses; $750,000 for future medical expenses; $10,000,000 for past pain, suffering and disability; and $5,000,000 for future pain, suffering and disability. The jury also awarded Amelia Heikkinen $500,000 for the loss of Hjalmer Heikkinen's society and companionship.
¶ 18 Catholic Mutual brought post-verdict motions for a new trial and to set aside the verdict, and alternatively requested that the order reference only Sections II and VII of the certificate. The court denied the motions and ordered judgment on the verdict based on the certificate as a whole. This appeal follows.

*249 II. ANALYSIS.
A. Bifurcation
¶ 19 Catholic Mutual asserts that the trial court erred in denying its motion to bifurcate coverage issues from damage issues. The trial court has inherent discretion to bifurcate issues of insurance coverage for reasons of judicial economy, and we reverse only in the event of an erroneous exercise of that discretion. See Waters ex rel. Skow v. Pertzborn, 2001 WI 62, ¶¶ 20-24, 243 Wis.2d 703, 627 N.W.2d 497.
¶ 20 The statutory authority for ordering separate trials can be found in WIS. STAT. § 805.05(2) and WIS. STAT. § 803.04(4). Section 803.04, entitled "Permissive joinder of parties," provides in relevant part:
(4) SEPARATE TRIALS. The court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom the party asserts no claim and who asserts no claim against the party, and may order separate trials or make other orders to prevent delay or prejudice.
¶ 21 Section 805.05, entitled "Consolidation; separate trials," provides in relevant part:
(2) SEPARATE TRIALS. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition or economy, or pursuant to s. 803.04(2)(b), may order a separate trial of any claim, cross-claim, counterclaim, or 3rd party claim, or of any number of claims, always preserving inviolate the right of trial in the mode to which the parties are entitled.
¶ 22 In addition, WIS. STAT. § 803.04(2)(b)[3] provides, specific to insurance companies, that a court may order separate trials on the issues of coverage and relief or liability.
¶ 23 Catholic Mutual insists that the trial court should have bifurcated the damage issues from the coverage issues to prevent emotional evidence of liability and damages from affecting the jury's view of coverage. It contends that the trial court erroneously concluded that because Catholic Mutual was not an insurance company, bifurcation was not available under WIS. STAT. § 803.04(2)(b). It instead maintains that WIS. STAT. §§ 803.04(4) and 805.05(2) provide ample authority to bifurcate, and submits that it was unfairly prejudiced by the trial court's mistaken view of its statutory authority to bifurcate.
¶ 24 We cannot agree that the trial court erred in refusing to allow bifurcation. Although we agree with Catholic Mutual that courts employ bifurcation in an effort to prevent emotional evidence from influencing *250 the jury's view on coverage, see, e.g, Fire Ins. Exchange v. Basten, 202 Wis.2d 74, 83-90, 549 N.W.2d 690 (1996), this principle does not control this issue.
¶ 25 When Catholic Mutual sought to bifurcate the coverage and damages issues, it also sought to stay discovery. The proceedings were delayed by three months, apparently due to a scheduling conflict, and the fact that the scheduling conference was also postponed. Contrary to Catholic Mutual's contention, in denying the motion to bifurcate the trial court did not make its decision based on the fact that Catholic Mutual was not technically an insurance company, but referenced WIS. STAT. § 803.04(2)(b) only by noting that it did not believe the statute applied to third parties. While Catholic Mutual correctly notes that WIS. STAT. §§ 803.04(4) and 805.05(2) do provide the court the authority to bifurcate, we are satisfied that the trial court's conclusion not to bifurcate was reasonable in light of the considerations set forth in §§ 803.04(4) and 805.05(2).
¶ 26 In making its ruling, the court considered the reality of the circumstances surrounding the case. In particular, the trial court took into account the fact that Heikkinen was eighty-four years old and severely injured, and came to the conclusion that any delay, which bifurcation would most likely produce, was not in Heikkinen's best interest and would be prejudicial to Heikkinen. See WIS. STAT. § 805.05(2). The trial court also expressed displeasure about the delays that had already been experienced, and noted that an expeditious resolution to this case was of paramount importance, adding that the court would try to expedite the trial. See WIS. STAT. § 803.04(4). The court also denied a subsequent motion for reconsideration for the same reason. On appeal, Catholic Mutual completely overlooks the fact that the trial court provided ample reasons for deciding not to bifurcate the trial. We are satisfied that the trial court's denial of bifurcation was an appropriate exercise of discretion. See Waters, 243 Wis.2d 703, ¶¶ 20-24, 627 N.W.2d 497.
B. Section II-D
1. Coverage
¶ 27 Catholic Mutual contends that the trial court erred in instructing the jury that Morse would have coverage under Section II-D if the jury found that she was driving her automobile "on behalf of" Christ King and/or the Archdiocese.
¶ 28 The trial court has broad discretion in formulating the special verdict question. Maci v. State Farm Fire Cas. Co., 105 Wis.2d 710, 719, 314 N.W.2d 914 (Ct.App.1981). "[T]he court's chosen form will not be rejected unless the inquiry, taken with the applicable instruction, does not fairly present the material issues of fact to the jury for determination." Topp v. Cont'l Ins. Co., 83 Wis.2d 780, 785, 266 N.W.2d 397 (1978).
¶ 29 The central issue is whether the special verdict question properly represented what was required for Morse to have coverage under the certificate.
¶ 30 Determining whether the special verdict question properly represented the certificate with respect to whether it covers Morse requires us to interpret the terms of the certificate. The interpretation of an insurance certificate is a question of law, which we review de novo. See State Farm Mut. Auto. Ins. Co. v. Langridge, 2004 WI 113, ¶ 13, 275 Wis.2d 35, 683 N.W.2d 75. We construe the certificate to give effect to the intent of the parties by giving words their common and ordinary meaning; that is, the meaning a reasonable person would understand the words to mean. Id., ¶¶ 13-14.
*251 ¶ 31 Section II-D, as mentioned, provides coverage to volunteers of Christ King and the Archdiocese "while acting within the scope of their duties or in their official capacity," but specifically excludes bodily injury or property damage incurred in connection with automobiles. It is undisputed that the automobile exclusion does not apply to religious volunteers "while using their own automobiles on behalf of the Certificate Holder or other Protected Person(s). . . ."
¶ 32 Catholic Mutual contends that the language that controls whether Morse is covered and that should have been included on the special verdict is whether Morse was "acting within the scope of [her] duties or in [her] official capacity. . . ." It explains that "an exclusion cannot create coverage where it otherwise does not exist under the governing insuring clause," and here, the governing insuring clause of Section II-D covers "volunteers, `while acting within the scope of their duties' or in their `official capacity' for `Protected Person(s),'" which includes Christ King and the Archdiocese, but not the Legion of Mary. Catholic Mutual therefore submits that Morse was not "`acting within the scope of [her] duties or in [her] official capacity' as a volunteer for either Christ King or the Archdiocese," and, as such, was unaffected by the exclusion/exception. It insists that the "on behalf of" language in the exception "simply confirms that employees and volunteers who otherwise have coverage under the II-D governing insuring clause will not lose that coverage by virtue of the exclusion" (emphasis in brief). In other words, it insists that the "pivotal legal issue . . . is whether the `on behalf of' language in the exception to the exclusion could provide coverage for Morse, even though at the time of the accident, she was not a `volunteer[] . . . of a Protected Person(s) while acting within the scope of [her] duties or in [her] official capacity as such."
¶ 33 We disagree. First, Catholic Mutual misunderstands the certificate in claiming that it does not create coverage for Morse where it otherwise does not exist. While Catholic Mutual is correct in noting that it is the governing insuring clause that determines whether coverage exists, they incorrectly assume that Morse would not otherwise be covered under the governing insuring clause. Catholic Mutual points to nothing in the certificate that precludes coverage for a volunteer of a protected person in a situation not involving an automobile.
¶ 34 As to their actual argument, the reason the trial court used the phrase "on behalf of" was not that it appeared in the exception to the automobile exclusion; rather, the court chose it because it concluded that acting "on behalf of Christ King Parish and/or the Milwaukee Archdiocese" was easier for the jury to understand and conveyed the same meaning as acting "within the scope of her duties or official capacity as a volunteer of Christ King Parish or of the Archdiocese of Milwaukee." The court made its decision after considering arguments by counsel, with counsel for the Heikkinens and counsel for Morse expressing a preference for simpler language and Catholic Mutual objecting, insisting that the question should reference the language of the certificate. In other words, the court did not phrase the special verdict question based on the wording of the automobile exception to the exclusion.
¶ 35 Perhaps realizing the weakness of its first argument, Catholic Mutual responds that acting "on behalf of" another is not synonymous with "acting within the scope of one's duties" to another. It cites Tower Insurance Co. v. Chang, 230 Wis.2d 667, 601 N.W.2d 848 (Ct.App.1999), which *252 involved coverage under a church's insurance policy for two church members who lit a candle that ultimately burned down the church. Catholic Mutual relies on the following language from Tower:
[W]e would like to make clear what this case is not about; it is not about coverage under the policy's volunteer clause. The volunteer clause brings persons in under the policy as additional insureds when they are "acting at the direction of, and within the scope of their duties for you [the church]." [The two church members] lit the candle between service and class, not during their stint as workers at the pancake supper. Thus, cases addressing the scope of duties as a volunteer are inapposite.
Id. at 673, 601 N.W.2d 848. According to Catholic Mutual, the above distinction is "critical" because it allegedly "negates any argument that someone driving her auto `on behalf of' a religious entity is thereby acting `within the scope of [his/her] duties' or in his/her `official capacity' as a volunteer for that entity." It explains that while a volunteer might be acting "on behalf of" another or for another's benefit, and might be doing so with another's approval or acquiescence, the volunteer is not acting "within the scope" of duties owed the other unless the person requested or directed the conduct, concluding that "as a matter of law" the jury's finding that Morse was acting "on behalf of" Christ King or the Archdiocese did not confer Section II-D coverage.
¶ 36 The Heikkinens contend that the "on behalf of" language "answers both 1) whether [Morse] was a volunteer of [a] protected person, and 2) whether [Morse] was acting within the scope of her duties," and thus, "if she was not acting within the scope of her duties, she would not be driving her automobile on behalf of a "protected person." They explain that using the phrase "on behalf of" instead of "acting within the scope of her duties or official capacity as a volunteer of Christ King Parish or the Archdiocese of Milwaukee" was more on point, avoided confusing the jury and was reasonable because the court considered the parties' arguments, the language of the certificate and the evidence presented.
¶ 37 The question is thus whether the phrase "on behalf of" properly represents the intent of the parties. We conclude that it does. The wording suggested by Catholic Mutual"At the time of the accident, was Margaret Morse acting within the scope of her duties or official capacity as a volunteer of Christ King Parish or the Archdiocese of Milwaukee?"is not only longwinded, but also confusing. While it can be interpreted as asking for whom Morse was a volunteer, it also appears to ask whether Morse was in fact a volunteer at all, a fact that was not in dispute. Similarly, while it can be interpreted as inquiring as to whether Christ King or the Archdiocese were the entities for whom Morse was acting within her duty or official capacity, it can also be read as questioning whether Morse's actions were in fact within the scope of her duties or official capacity, even though it is undisputed that the delivery of the statue was among Morse's duties as a volunteer. The jury could not have reasonably been expected to decipher the meaning of such a question.
¶ 38 The central issue was hence not whether Morse was a volunteer or whether she was acting within the scope of her duties, because it was undisputed that at the time of the accident, she was a volunteer, and that her actionsthe delivery of a statuewere within the scope of her duties. Rather, as the Heikkinens correctly note, the issue was for whom was Morse acting as a volunteer: only the Legion of Mary, or also Christ King and/or the Archdiocese? *253 In light of the numerous potential misinterpretations outlined above, it is understandable that the court preferred a simpler phrasing. Considering that what was really disputed was for whom Morse was delivering the statue, a simpler way to ask the same question was to ask whether Morse was acting "on behalf of" Christ King and/or the Archdiocese. Under the unusual facts of this case, where neither Morse's status as a volunteer, nor the fact that the delivery of the statue was within her duties was disputed, we are satisfied that the "on behalf of" language does indeed carry the same meaning as a "volunteer of a protected person" while acting within "the scope of their duties or in their official capacity" that was used by the parties in the certificate. See State Farm, 275 Wis.2d 35, ¶¶ 13-14, 683 N.W.2d 75.
¶ 39 Moreover, the phrases "volunteer of a protected person" and "acting within the scope of their duties or in their official capacity" from the certificate, which Catholic Mutual sought to include on the special verdict, are not defined in the certificate. This supports the conclusion that the trial court's decision to instead use "on behalf of" was reasonable. The fact that the court chose the "on behalf of" wording in an effort to make the question clearer and simpler for the jury, and after considering arguments by counsel, also indicates that the decision was reasonable.
¶ 40 We are also unpersuaded by Catholic Mutual's claim that Tower supports their argument. Unlike this case, which turns on the wording of the certificate, Tower involved an insurance policy with a wording unlike that of the certificate here. Id., 230 Wis.2d at 670, 601 N.W.2d 848. In addition, this case is factually dissimilar from Tower. In Tower, the church's insurance company brought a subrogation claim against the two volunteers who lit the candle, and this court concluded that the two church members were covered, making the insurance company unable to subrogate against its own insureds. Id. at 670-71, 601 N.W.2d 848. This case of course does not involve subrogation. Moreover, this court's statement in Tower that the case was not about the volunteer clause of the insurance policythe language on which Catholic Mutual relieswas merely a determination made in light of the facts of that case, that the two were not engaged in volunteering at the time they lit the candle. Id. at 673, 601 N.W.2d 848. Here, it is undisputed that Morse was volunteering, and in any event, the language in Tower was based on the wording of the insurance policy, which as noted is irrelevant for purposes of determining coverage under the certificate.[4]
*254 2. Sufficiency of Evidence
¶ 41 Having determined that the trial court's wording of the contested special verdict question was proper, thus concluding that Section II-D provides coverage for Morse if she was driving her car "on behalf of" Christ King or the Archdiocese, we next analyze whether there was sufficient evidence for the jury to conclude that Morse was in fact driving her automobile on behalf of Christ King or the Archdiocese.
¶ 42 "The standard of review of a jury verdict is that it will not be upset if there is any credible evidence to support it."[5]Meurer v. ITT Gen. Controls, 90 Wis.2d 438, 450, 280 N.W.2d 156 (1979); see WIS. STAT. § 805.14(1).[6] We must consider the evidence "in a light most favorable to the jury's determination[,]" because it is up to the jury, not an appellate court, to balance the credibility of witnesses and the weight given to testimony. Morden v. Continental AG, 2000 WI 51, ¶ 39, 235 Wis.2d 325, 611 N.W.2d 659 (citations omitted). We must "search the record for credible evidence that sustains the jury's verdict, not for evidence to support a verdict that the jury could have reached but did not," and "[i]f we find that there is `any credible evidence in the record on which the jury could have based its decision,' we will affirm that verdict." Id. (citation omitted). Moreover, "if the evidence gives rise to more than one reasonable inference, we accept the particular inference reached by the jury." Id. (citation omitted).
¶ 43 Catholic Mutual asserts that the evidence established that Morse was acting solely as a volunteer for the Legion of Mary, and not "on behalf of" Christ King or the Archdiocese, and claims, without citation to authority, that "to be deemed acting `on behalf of' another . . . the latter must request performance of the conduct [or] the `beneficiary' of the conduct must be aware that it is to occur and must endorse or sponsor it[]." It points to three specific reasons for why the Heikkinens and Morse have allegedly failed to establish any of these elements.
¶ 44 First, Catholic Mutual asserts that Morse was not acting "on behalf of" the Archdiocese. It contends that there was "no evidence establishing that the Archdiocese knew about the Legion[of Mary]'s statue delivery program, much less that it requested, sponsored or endorsed the program." It insists that "unless the court were to interpret `on behalf of' as simply meaning that the conduct at issue results in some `benefit' to a Protected Person, there is no way that Morse's delivering Legion [of Mary] statues was undertaken `on behalf of' the Archdiocese," which would result in virtually limitless liability *255 for any volunteer whose work benefits the Archdiocese.
¶ 45 Second, Catholic Mutual asserts that Morse was also not acting "on behalf of" Christ King. It insists that there was no evidence suggesting that any representative of Christ King ever "expressly or implicitly" requested the Legion of Mary to make deliveries of statues within the parish, and as with the Archdiocese, maintains that conduct that simply benefits Christ King or which has Christ King's acquiescence is not undertaken "on its behalf." It further claims that even if coverage could be established based on endorsement or sponsorship, the evidence does not support such a finding because while Christ King did not prevent the deliveries, Christ King did not affirmatively endorse or sponsor them, and failure to act does not constitute endorsement or sponsorship.
¶ 46 Finally, Catholic Mutual claims that even if Morse were acting "on behalf of" Christ King when she delivered the statues within the Christ King Parish, on the day of the accident she was making a delivery to a family that resided in St. Pius Parish. Therefore, its argument goes, because she was making the delivery to a location outside the parish, she could not have been acting "on behalf of" Christ King and was acting solely as a Legion of Mary volunteer.
¶ 47 We disagree and conclude that there was ample evidence for the jury to find that Morse was driving her automobile "on behalf of" Christ King and/or the Archdiocese. The record reveals that the Legion of Mary's connection to Christ King and the Archdiocese was closer than Catholic Mutual and the Archdiocese would have us believe. Indeed, the record is replete with evidence showing that the Legion of Mary was not only affiliated with Christ King and/or the Archdiocese, but its existence and mission were directly dependent upon the endorsement of, support from and cooperation with Christ King and/or the Archdiocese.
¶ 48 The Legion of Mary at Christ King was founded by the Christ King pastor in 1968. It is a chapter of a larger international Catholic sodality by the same name, founded in Ireland in 1921. This chapter consists of only members of Christ King Parish. Since its inception, a Christ King priest has been the designated spiritual adviser to this chapter of the Legion of Mary. The Legion of Mary's handbook describes the organization as follows:
The Legion of Mary is at the disposal of the archdiocese and the parish priest to perform acts of social service and Catholic action which the authorities may deem suitable for legionnaires and useful for the welfare of the church. The Legion shall not perform any of these services whatsoever in a parish without the sanction of the parish priest or of the Ordinary.
An announcement in the Christ King church bulletin described the Legion of Mary as "a group of practicing Catholics under the direction of their parish priest" and invited any individuals interested in joining to phone the parish priest. Father Dennis Ackert, who was pastor of the Christ King Church from 1990 until 2003, although not the Legion of Mary's spiritual advisor and thus had little direct contact with the members,[7] testified that when members of the Legion of Mary go to the homes of parishioners, they are assisting the clergy.
¶ 49 Morse, who has been a member of the Legion of Mary since 1968, testified that the organization's purpose is for the members, all of whom are volunteers, to *256 serve the parish priest and the church in any way they can. The members are expected to do two hours of service per week and meet once per week to discuss their mission. Since 1968, these meetings have taken place in various buildings owned by Christ King, including the rectory, the Christ King Grade School, and the former convent, which came to be referred to as the Parish Center of Christ King Church, and over the years some priests regularly attended these meetings. The group's supplies are stored at the parish, where the Legion of Mary also has a mail slot. The Legion of Mary thus clearly functions to help the priest and is dependent upon Christ King's facilities.
¶ 50 The activities in which the members engage include visiting families that have suffered a loss, visiting the parents of newborns, and at one time they conducted a census of members in the community. Morse testified that all of the activities that the Legion of Mary engages in, including the statue delivery program, are done only with the permission of the priest. She also specifically testified that on at least one occasion the group discontinued an activity because the priest requested that they do so. George Weiland, the president of Morse's chapter of the Legion of Mary, also testified that the volunteers are always ready to do what the priest asks them do so, that the priests have the authority to forbid the volunteers from doing activities, and the volunteers are thus at the disposal of the bishop of the Archdiocese or the parish priest for every form of service. The parish priest thus clearly controls the activities and facilitates the mission of the Legion of Mary.
¶ 51 The evidence also established that the statue delivery program is one of the Legion of Mary's major activities. The deliveries occur only if a parishioner of any Catholic church specifically requests a statue, and that all of the statues have been blessed by a parish priest. Along with the statues, the members also deliver religious items, including rosaries that have also been blessed by a priest, as well as photographs, literature, prayer books, leaflets, etc. The Legion of Mary purchases all such items using Christ King Church's tax identification number, which allows the group to purchase them without paying sales tax and with a discount. Wayne Schneider, the Treasurer and Chief Financial Officer of the Milwaukee Archdiocese, testified that Christ King and the Archdiocese have a strict policy of requiring outside organizations that wish to use their facilities to furnish a certificate of insurance or to sign a hold harmless agreement. The Legion of Mary was never required to produce an insurance certificate or to sign a hold harmless agreement, thus suggesting that the Legion of Mary is considered part of Christ King. Schneider also testified that the Archdiocese's insurance contract covers a parish member if he or she is doing something at the direction of the priest.
¶ 52 The statue delivery program was thus clearly run with the active participation of the priests, as the program's purpose was for the members to bring an object blessed by the priest to homes of parishioners. The fact that the Legion of Mary uses Christ King's tax identification number clearly represents that the organization is part of Christ King. Additionally, Schneider's testimony shows that the Legion of Mary enjoyed a special status and was connected to both Christ King and the Archdiocese on many levels. These facts plainly contradict Catholic Mutual's claims that the Archdiocese was unaware of the Legion of Mary, that Christ King did not engage in conduct that affirmatively endorsed or sponsored the Legion of Mary, and that no representative of Christ King *257 requested that the Legion of Mary make the statue deliveries.
¶ 53 We are also not persuaded by Catholic Mutual's claim that Morse was not acting on behalf of Christ King because the delivery in question was to an address located outside of Christ King Parish. The assertion that by virtue of the destination being in a different parish this delivery is distinguishable from others attempts to make a distinction where none exists: both parishes, Christ King and St. Pius, were part of the Milwaukee Archdiocese. Nor is there any evidence that the Christ King Parish priest ever instructed the Legion of Mary to limit its activity to the geographic boundaries of the parish. Nothing in the certificate or the record gives merit to an attempt to limit coverage based on a geographical boundary.
¶ 54 Consequently, we are satisfied that there was more than enough credible evidence presented on which the jury could conclude that Morse was acting "on behalf of" Christ King and/or the Archdiocese. See Morden, 235 Wis.2d 325, ¶ 39, 611 N.W.2d 659.
C. Section VII
¶ 55 Next, Catholic Mutual also asserts that regardless of any potential Section II-D coverage (with a $500,000 limit), Morse had no coverage under the excess liability umbrella in Section VII (with a $40,000,000 limit), because Morse and the Heikkinens waived any Section VII coverage by directing their efforts solely at establishing Section II-D coverage.[8] The Heikkinens and Morse respond that Catholic Mutual waived the argument that Section VII coverage was unavailable to Morse because the argument was never raised at the trial court. We cannot agree with Catholic Mutual.
¶ 56 After post-verdict motions, the Heikkinens submitted an order for judgment based on the jury's finding that Morse was acting "on behalf of" Christ King and/or the Archdiocese at the time of the accident, and that this triggered coverage under the certificate. Catholic Mutual objected, requesting that the judgment reference only Sections II and VII, not the certificate as a whole. The trial court denied the request and approved the proposed order, reasoning that although courts are often asked to make declaratory judgments with respect to insurance coverage, here the court was never asked to do so, and concluded that it did not think that, after the jury had already made its finding, "at this late date [it] should be asked to make specific findings." Thus, not until after the post-verdict motions was there even a suggestion that coverage under one section would not also imply coverage under the entire certificate.
¶ 57 On appeal, inconsistent with its objection to the proposed order, Catholic Mutual now claims, for the first time, that coverage was not in fact available to Morse under Section VII, by insisting that the Heikkinens and Morse failed to argue that Section VII coverage existed for Morse. Catholic Mutual's failure to raise the issue of whether Section VII coverage was available to Morse falls within the waiver rule, Hartford Ins. Co. v. Wales, 138 Wis.2d 508, 518, 406 N.W.2d 426 (1987) (failure to timely raise an issue at the trial court level results in waiver of the right to appellate review of that issue), see WIS. *258 STAT. § 805.12(2)[9]; however, in the interest of clarifying the relationship between Section II and Section VII, we exercise our discretion and briefly address the issue of Section VII coverage, see Hartford, 138 Wis.2d at 522, 406 N.W.2d 426.
¶ 58 The claim that coverage under Section II does not imply coverage under Section VII is simply incorrect. Section VII, as explained, provides that "the coverage afforded by this form shall follow the terms and conditions of the underlying coverage as shown." This language clearly indicates that Section VII coverage has no independent requirements other than satisfying the terms and condition of the underlying coverage. "Underlying coverage" is defined in the certificate as follows:
Underlying Coverage means all certificates of policies listed in the schedule of underlying coverage, including all endorsements attached thereto, plus applicable limits of any other underlying protection (whether insurance of self-insurance including deductible) collectible by you. This definition also is intended to include any self-insured retention endorsement.
Thus, if coverage does exist under the underlying section, Section II, this results in coverage under Section VII because Section VII incorporates the terms and conditions of Section II. Because the jury found that Morse was covered by Section II, she was also covered by Section VIIno additional arguments were required to establish Section VII coverage.
D. Damages
¶ 59 Finally, Catholic Mutual asserts that damages are excessive.[10] In reviewing a jury's damage award, we do not substitute our own judgment for that of the fact finder, but review the award in the light most favorable to sustaining the award. See Teff v. Unity Health Plans Ins. Corp., 2003 WI App 115, ¶ 41, 265 Wis.2d 703, 666 N.W.2d 38. "If there is any credible evidence which under any reasonable view supports the jury finding as to the amount of damages, especially where the verdict has the approval of the trial court, this court will not disturb the finding unless the award shocks the judicial conscience." Ford Motor Co. v. Lyons, 137 Wis.2d 397, 446, 405 N.W.2d 354 (Ct.App.1987).
¶ 60 As noted, the jury awarded $558,366.06 for past medical expenses, $750,000 for future medical expenses, $10,000,000 for past pain, suffering and disability, $5,000,000 for future pain, suffering and disability, and $500,000 to Amelia Heikkinen for loss of society and companionship.
¶ 61 Catholic Mutual points to Heikkinen's limited life expectancy, for reasons unrelated to the accident, and cites foreign case law that has upheld smaller awards for younger victims in an effort to show that the jury award was excessive. We cannot agree.
*259 ¶ 62 In denying Catholic Mutual's post-verdict motion for a new trial, the trial court recited in detail the awful quality of life Heikkinen now has due to his many physical injuries, including an amputated leg and lack of bowel and bladder functions, as well as the enormous emotional strain that Heikkinen is facing as a result of the accident, including embarrassment and complete dependence on others. The jury came to the conclusion it did. That conclusion did not shock the conscience of the trial court and does not shock ours. See id. We thus see no reason to disturb the jury's finding, particularly in light of the trial court's thoroughly-reasoned approval of the award. See id. Consequently, we affirm.
Judgment affirmed.
NOTES
[] Petition for Review Filed.
[1] The Common Good Institute, Inc., a nonprofit legal forum coalition, has filed an amicus curiae brief in support of Catholic Mutual, arguing that the trial court should have ruled as matter of law whether Morse was covered by the Archdiocese's insurance certificate, or alternatively provided the jury with guidelines for when volunteers of lay or other independent groups are acting "on behalf of" religious entities, and that where the application of law is likely to implicate social policy, judges should rule as a matter of law.

Because we conclude that the trial court did not err in submitting the question of coverage under the certificate to the jury and properly formulated the special verdict question, we decline to further comment on the arguments raised by the Common Good Institute, Inc.
[2] All references to the Wisconsin Statutes are to the 2003-04 version unless otherwise noted.
[3] WISCONSIN STAT. § 803.04(2)(b) provides:

If an insurer is made a party defendant pursuant to this section and it appears at any time before or during the trial that there is or may be a cross issue between the insurer and the insured or any issue between any other person and the insurer involving the question of the insurer's liability if judgment should be rendered against the insured, the court may, upon motion of any defendant in the action, cause the person who may be liable upon such cross issue to be made a party defendant to the action and all the issues involved in the controversy determined in the trial of the action or any 3rd party may be impleaded as provided in s. 803.05. Nothing herein contained shall be construed as prohibiting the trial court from directing and conducting separate trials on the issue of liability to the plaintiff or other party seeking affirmative relief and on the issue of whether the insurance policy in question affords coverage. Any party may move for such separate trials and if the court orders separate trials it shall specify in its order the sequence in which such trials shall be conducted.
[4] Catholic Mutual also argues that equating acting "on behalf of" with acting "within the scope of one's duty" would conflict with principles of agency and tort law. Citing Kerl v. Dennis Rasmussen, Inc., 2004 WI 86, ¶¶ 19-23, 273 Wis.2d 106, 682 N.W.2d 328, and Arsand v. City of Franklin, 83 Wis.2d 40, 45-50, 264 N.W.2d 579 (1978), it references the doctrine of respondeat superior, and asserts that to be "acting within the scope of one's duties," an individual, including a volunteer, must first be deemed an agent of the principal, and only if this principal-agent relationship exists does the volunteer owe a "duty" and may the principal be liable for a tort committed by the servant-agent. It thus insists, as it did at the trial court level, that Morse could be covered by Section II-D only if she was an "agent" for Christ King or the Archdiocese, and because she was not, the jury's finding does not confer coverage under Section II-D.

We are not persuaded. The certificate clearly distinguishes between volunteers, agents, officers, and servants. Morse was a volunteer and it was never alleged that she was an agent. Nothing in the certificate indicates that it is necessary to also qualify as an agent in order to be a volunteer. As Catholic Mutual notes, Kerl and Arsand concern the doctrine of respondeat superior. That doctrine has no applicability to this case.
[5] Catholic Mutual invites us to review the issue de novo, asserting that "[b]ecause there was no claim that the term `on behalf of' . . . was ambiguous, and no evidence was submitted relating to the interpretation of that term, and because what Morse was doing at the time of the accident was undisputed," the issue before us is one of law. We disagree. The issue concerns the sufficiency of evidence, which we review under the well-settled standard set forth above.
[6] WISCONSIN STAT. § 805.14 provides, in relevant part:

(1) TEST OF SUFFICIENCY OF EVIDENCE. No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.
[7] The priest who was the Legion of Mary's spiritual advisor did not testify at trial.
[8] Catholic Mutual also claims that, as a matter of law, Morse had no section VII coverage, even if she had been driving her automobile "on behalf of" Christ King or the Archdiocese, because acting "on behalf of" someone is not synonymous to acting "within the scope of one's duties." We already rejected this argument in section B.1. of this opinion.
[9] WISCONSIN STAT. § 805.12 provides, in relevant part:

(2) OMITTED ISSUE. When some material issue of ultimate fact not brought to the attention of the trial court but essential to sustain the judgment is omitted from the verdict, the issue shall be deemed determined by the court in conformity with its judgment and the failure to request a finding by the jury on the issue shall be deemed a waiver of jury trial on that issue.
[10] Morse and USAA explicitly decline to take any position on the issue of whether the damages were excessive because "[w]hether those damages are $5,000,000 or $10,000,000, instead of $16,000,000+, they greatly exceed USAA's policy limits and Morse is unable to pay them."