**2022 WI App 32**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:          2020AP1593

†Petitions for Review filed

Complete Title of Case:


STEVE COLUMB AND NORB COLUMB,

  PLAINTIFFS,

 V.

GREGORY COX AND KATHERINE COX,

  DEFENDANTS-THIRD-PARTY
  PLAINTIFFS-APPELLANTS,†

 V.

BAY TITLE & ABSTRACT, INC. AND BUDDE FIFAREK,

  THIRD-PARTY DEFENDANTS,

WFG NATIONAL TITLE INSURANCE COMPANY,

  THIRD-PARTY DEFENDANT-RESPONDENT,

PETER L. PUTIRSKIS AND DEBORAH ANN PUTIRSKIS,

  THIRD-PARTY DEFENDANTS-CO-APPELLANTS.†

---

Opinion Filed:        June 7, 2022
Submitted on Briefs:   June 8, 2021

| JUDGES: | Stark, P.J., Hruz and Nashold, JJ. |
|---|---|
| Concurred:<br>Dissented: | |

| Appellant<br>ATTORNEYS: | On behalf of the defendants-third-party plaintiffs-appellants, the cause was submitted on the briefs of *Brian T. Flood* of *Gerbers Law, S.C.*, Green Bay. |
|---|---|
| | On behalf of the third-party defendants-co-appellants, the cause was submitted on the briefs of *George Burnett* of *Conway, Olejniczak & Jerry, S.C.*, Green Bay. |
| Respondent<br>ATTORNEYS: | On behalf of the third-party defendant-respondent, the cause was submitted on the brief of *Bridget M. Hubing* and *Malinda J. Eskra* of *Reinhart Boerner Van Deuren s.c.*, Waukesha. |

**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 7, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No.    2020AP1593** | Cir. Ct. No.  2019CV115 |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS** |

---

STEVE COLUMB AND NORB COLUMB,

    PLAINTIFFS,

  V.

GREGORY COX AND KATHERINE COX,

    DEFENDANTS-THIRD-PARTY
    PLAINTIFFS-APPELLANTS,

  V.

BAY TITLE & ABSTRACT, INC. AND BUDDE FIFAREK,

    THIRD-PARTY DEFENDANTS,

WFG NATIONAL TITLE INSURANCE COMPANY,

    THIRD-PARTY DEFENDANT-RESPONDENT,

PETER L. PUTIRSKIS AND DEBORAH ANN PUTIRSKIS,

    THIRD-PARTY DEFENDANTS-CO-APPELLANTS.

---

APPEAL from an order of the circuit court for Marinette County: JANE M. SEQUIN, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Nashold, JJ.

¶1    NASHOLD, J.   This appeal relates to a dispute between neighbors—Steve and Norb Columb and Gregory and Katherine Cox—about the use and location of an easement running through the Coxes' property.  The Columbs sued the Coxes for interfering with the Columbs' easement rights, and the Coxes sought coverage under their title insurance policy ("the Policy") with WFG National Title Insurance Company ("WFG").  After WFG denied the claim, the Coxes brought a third-party complaint against WFG for breach of contract.  Among other parties, the Coxes also sued the sellers of the property, Peter L. and Deborah Ann Putirskis, alleging that the Puteriskises had misrepresented the easement's location.  The circuit court granted WFG's motion for summary judgment and dismissed the Coxes' complaint against WFG, determining that WFG owed no coverage under the Policy.  The Coxes and the Putirskises separately appeal.

¶2    We conclude that, under the circumstances of this case, the fact that WFG issued the Policy three years after its commitment to do so does not affect its ability to assert coverage defenses.  We further conclude that the Policy excepts coverage for the claims at issue in this dispute.  Accordingly, we affirm.

## BACKGROUND

¶3    The material facts are not in dispute.  The Columbs and the Coxes own parcels in Marinette County.  Both parcels are located north of County Highway X, which runs east-west.  The Coxes' property abuts County Highway X

to the north. The Columbs' property lies north of the Coxes' property, with two side-by-side parcels separating the Columbs' and the Coxes' properties.

¶4 Willard DeGroff formerly owned the Columbs' property, the Coxes' property, and the two properties between them. In the mid-1990s, in four transactions, DeGroff deeded the northern portion of his property to the Columbs, the southern portion of his property to the Putirskises, and the two properties in between to other owners.[1] We refer to these deeds collectively as "the DeGroff Deeds" and to specific deeds, in chronological order, by number.

¶5 DeGroff Deed 1, for the Columbs' property, establishes an easement ("the Original Easement"). The Original Easement starts at County Highway X and runs northeast through the Putirskises' property and onto the Columbs' property, thereby providing the Columbs with access to the highway. DeGroff Deeds 2 and 3, for the properties not relevant to this appeal, convey an interest in the Original Easement. DeGroff Deed 4, for the Putirskises' property, reserves the Original Easement for the use of several parcels, including the parcel owned by the Columbs.

¶6 In 2016, the Putirskises recorded a modification of the Original Easement ("the Modification"). The Modification purports to reroute the easement's location to the east, away from the house and other buildings on the property. We refer to the easement in its purported new location as "the Modified Easement." The Columbs, however, did not sign the Modification and apparently never agreed to move the easement from its original location.

---

[1] The owners of the properties between the Coxes' and the Columbs' properties are: (1) Norb Columb; and (2) Norb and Dennis Columb, as joint tenants. Norb Columb, as one of the plaintiffs in this suit, is not asserting any claims as the owner of either of these other properties.

3

¶7     In January 2017, the Putirskises sold their property to the Coxes. An addendum to this deed states that the property is "subject to that ingress/egress easement set forth in [DeGroff Deed 1], as modified in [the Modification]."

¶8     In 2019, the Columbs sued the Coxes for wrongful interference with the easement, alleging that the Coxes consistently parked vehicles in or otherwise blocked the Original Easement. The Columbs alleged that the Coxes' actions began around the time of the Coxes' purchase, were ongoing, and persisted even after the Columbs, their counsel, and the Marinette County Sheriff's Department told the Coxes to stop interfering with the Columbs' use of the easement. The Columbs sought compensatory damages and an order enjoining the Coxes from interfering with their easement rights. The Coxes answered and requested an injunction prohibiting the Columbs from further trespass and a judicial determination of the location, scope, and other provisions of any easement in which the Columbs retained easement rights.

¶9     The Coxes tendered their defense of the Columbs' claims to their title insurer, WFG, which denied the claim. The Coxes then filed a third-party complaint against WFG for breach of contract. The third-party complaint also sues: (1) Bay Title & Abstract, Inc. ("Bay Title"), WFG's policy-issuing agent; (2) Budde Fifarek, a Bay Title employee who drafted the Modification for the Putirskises; and (3) the Putirskises. The Coxes' claims against these third-party defendants are not at issue in this appeal.

¶10     On WFG's motion, the circuit court bifurcated the merits and coverage determinations and stayed the underlying lawsuit. WFG moved for summary judgment, arguing that there was no coverage under the Policy. The court granted WFG's motion, dismissed the Coxes' claim against WFG, and dismissed

WFG as a party. The Coxes and the Putirskises separately appeal. Additional facts are provided below where pertinent.

## DISCUSSION

¶11 We review a circuit court's grant of summary judgment de novo, affirming when the pleadings and evidence submitted demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See* WIS. STAT. § 802.08(2) (2019-20)[2]; *State Farm Mut. Auto. Ins. Co. v. Langridge*, 2004 WI 113, ¶12, 275 Wis. 2d 35, 683 N.W.2d 75. Likewise, the interpretation of an insurance policy is a question of law that we decide de novo. *Langridge*, 275 Wis. 2d 35, ¶13.

¶12 The Coxes[3] raise two categories of argument on appeal. First, they argue that WFG cannot rely on Policy exceptions that might otherwise preclude coverage because WFG issued the Policy three years late. Second, they argue that

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[3] The Coxes and the Putirskises submitted separate briefing, but their arguments largely overlap. For ease of reading, we refer to the Coxes as raising all of the arguments made in either the Coxes' or the Putirskises' briefing.

Relatedly, WFG argues that "the Putirskises have no right to appeal the circuit court's decision" because "only the Coxes are in privity of contract with WFG." This argument confuses the Putirskises' contractual rights, if any, with the Putirskises' standing to appeal as aggrieved parties. *See Koller v. Liberty Mut. Ins. Co.*, 190 Wis. 2d 263, 266, 526 N.W.2d 799 (Ct. App. 1994) ("The right to appeal is limited to parties aggrieved in some appreciable manner by the judgment…. A person is aggrieved if the judgment bears directly and injuriously upon his or her interests." (citation omitted)). WFG does not engage with the standard for determining whether an appellant is an aggrieved party. Accordingly, we do not address this argument. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we may decline to review issues inadequately briefed or unsupported by legal authority).

the Policy itself requires WFG to defend and indemnify them in this lawsuit. We reject these arguments and conclude that the circuit court properly granted summary judgment to WFG on the coverage issue.

### *I. WFG's Untimely Issuance of the Policy Does Not Affect Its Coverage Obligations.*

¶13 As background, WFG issued the Coxes' title insurance commitment ("the Commitment") on January 10, 2017, thirteen days before the Coxes recorded their deed.[4] It is undisputed that, through some error on WFG's part, WFG did not issue the Policy until April 2020, several months after the Coxes filed their third-party complaint against WFG. The initial issue before us is what effect, if any, the late issuance of the Policy should have on WFG's coverage obligations. In particular, as we discuss below, Schedule B of the Policy excepts coverage for disputes relating to the "rights and/or claims of others in and to," and the "terms and provisions as to the use and maintenance of," "that ingress/egress easement as set forth in [DeGroff Deeds 1-4] and as modified in [the Modification]."[5] We refer to the two Schedule B exceptions relating to the "ingress/egress easement" as "the Easement Exceptions." Before we analyze whether the Easement Exceptions *do*

---

[4] For ease of reading, we refer to WFG (and not its agent, Bay Title) as issuing the Commitment and the Policy.

[5] Specifically, these exceptions refer to "that ingress/egress easement … as modified in Doc. No. 810096." For the majority of this decision, we assume that "Doc. No. 810096" is the Modification (i.e., we treat these exceptions as referencing the Modification). We address in ¶¶38-39 of this decision the Coxes' argument that these exceptions should not apply because WFG mistakenly referenced the wrong document number. (The correct document number ends with a 4, not a 6.)

To avoid unnecessary distraction to the reader, throughout this decision we omit some capitalization where quoting from the Commitment and the Policy.

apply, however, we must address the Coxes' arguments that they *cannot* apply, as a matter of law, because the policy was issued late.

¶14     At this point, it will be helpful to discuss the effects and purposes of the title insurance policy versus the commitment, and the rights to the insured that stem from both. We do so with reference to this Policy: a standard 2006 American Land Title Association ("ALTA")[6] owner's policy.

¶15     "Title insurance is a contract of indemnity which obligates the title insurer to pay loss as defined by the policy." *First Am. Title Ins. Co. v. Dahlmann*, 2006 WI 65, ¶12, 291 Wis. 2d 156, 715 N.W.2d 609 (citation omitted). "The purpose of title insurance is to indemnify the insured for impairment of its interest due to failure of title as guaranteed in the title insurance report." *Id.* (citation omitted); *see also* *Laabs v. Chicago Title Ins. Co.*, 72 Wis. 2d 503, 510, 241 N.W.2d 434 (1976) ("A policy of title insurance means the opinion of the company which issues it, as to the validity of the title, backed by an agreement to make that opinion good, in case it should prove to be mistaken, and loss should result in consequence to the insured." (citation omitted)); J. BUSHNELL NIELSEN, TITLE ESCROW CLAIMS GUIDE § 9.1.1 (2021 ed.) ("The title insurance policy protects

---

[6] "The American Land Title Association, founded in 1907, is the national trade association representing the title insurance industry." *First Am. Title Ins. Co. v. Dahlmann*, 2006 WI 65, ¶26 n.13, 291 Wis. 2d 156, 715 N.W.2d 609.

against all manner of defects or infirmities in title, and encumbrances and liens that attach to the title.").[7]

¶16 Accordingly, the Coxes' Policy states that, "subject to the exclusions from coverage, the exceptions from coverage contained in Schedule B, and the conditions," WFG insures against "loss or damage, not exceeding the amount of insurance, sustained or incurred by the insured by reason of" ten covered risks.[8] This appeal implicates Covered Risk 2, covering losses stemming from "any defect in or lien or encumbrance on the title." Our supreme court has defined a "title defect" as "a claim or interest that is inconsistent with the title purportedly transferred," and it has classified an encumbrance (including an easement) as one type of title defect.[9] *See **Dahlmann***, 291 Wis. 2d 156, ¶¶14-15.

---

[7] In this decision, we rely extensively on J. BUSHNELL NIELSEN, TITLE ESCROW CLAIMS GUIDE (2021 ed.), excerpts of which were submitted to the circuit court on summary judgment, and which our courts have cited as an authority on title insurance. *See **Dahlmann***, 291 Wis. 2d 156, ¶25; ***Piper v. Nitschke's N. Resort Condo. Owner's Ass'n, LLC***, 2009 WI App 182, ¶15, 322 Wis. 2d 604, 777 N.W.2d 677.

[8] A separate condition of the Policy makes clear that WFG will provide a defense to the insured where a third-party plaintiff asserts a covered claim.

[9] The parties dispute whether, for purposes of applying Covered Risk 2, an encumbrance (i.e., an easement) is a title defect. Defined broadly, "[a] title defect is a claim or interest that is inconsistent with the title purportedly transferred," so an encumbrance is considered a title defect. ***Dahlmann***, 291 Wis. 2d 156, ¶¶14-15. Defined narrowly, a "title defect" is "an insufficiency … in the records by which the title is proven" (such as a forgery or an inaccurate legal description), whereas "[a]n encumbrance is any right of a third person in real property that diminishes the value of the insured's title but does not prevent the passing of the interest." JOYCE PALOMAR, 1 TITLE INSURANCE LAW § 5.5 (2021 ed.). Thus, under the narrower definition, an encumbrance is distinct from a title defect. The Policy reflects this view, in that Covered Risk 2 distinctly and separately addresses losses stemming from title defects, liens, and encumbrances. We note that "[c]ourts tend to use the terms ["title defect," "lien," and "encumbrance"] loosely and interchangeably in cases pertaining to title insurance coverage." *See **id***. Moreover—as we explain further in Section II— we do not decide whether or which provision of Covered Risk 2 in fact provides an initial grant of coverage because we conclude that Schedule B excepts coverage. Accordingly, we do not further address the parties' arguments on this issue.

¶17    A title insurance policy insures title for an identified piece of land—the land described in Schedule A of the policy. NIELSEN, TITLE ESCROW CLAIMS GUIDE § 9.2. A policy also contains two types of provisions that limit coverage: exclusions and exceptions. *Dahlmann*, 291 Wis. 2d 156, ¶25. "[E]xclusions refer to subjects beyond the ambit of the policy, while exceptions are matters generally within the scope of the insuring provision." *Id.* (citation omitted). Schedule B sets forth general (applicable to all insureds) and specific (applicable to the particular insured) exceptions to coverage. NIELSEN, TITLE ESCROW CLAIMS GUIDE § 9.1.1. As stated, this appeal concerns the application of the Easement Exceptions: two specific Schedule B exceptions relating to the Columbs' and the Coxes' "ingress/egress easement."

¶18    In contrast, a title insurance commitment or title binder is an offer of title insurance. NIELSEN, TITLE ESCROW CLAIMS GUIDE § 6.1; *see also* ***Greenberg v. Stewart Title Guar. Co.***, 171 Wis. 2d 485, 488, 492 N.W.2d 147 (1992) ("A title commitment is a document which describes the property as the title insurer is willing to insure it and contains the same exclusions and general and specific exceptions as later appear in the title insurance policy."). Thus, the Coxes' Commitment states that it "is a contract to issue one or more title insurance policies."

¶19    Generally speaking, the commitment merges with the policy when the policy is issued, precluding a cause of action under the commitment. NIELSEN, TITLE ESCROW CLAIMS GUIDE § 6.2. The Coxes' Commitment reflects this fact, stating that "[a]ll liability and obligation under this Commitment shall cease and terminate ninety (90) days … after the effective date [of the Commitment] or when

the policy … committed for shall issue, whichever first occurs."[10]  Likewise, the Coxes' Policy states that liability is limited to the Policy and that the Policy, together with any endorsements, constitutes the entire contract between the Coxes and WFG.

¶20    A commitment contains Schedules A and B[11] that mimic those in the policy but serve different purposes, in that the schedules in the commitment necessarily concern the offer of insurance.  *See* NIELSEN, TITLE ESCROW CLAIMS GUIDE § 6.1.  Thus, here, the Coxes' Policy Schedule B sets forth exceptions to coverage, whereas Commitment Schedule B notifies the Coxes that the Policy will contain "the following" "exceptions" "unless the same are disposed of to the satisfaction of" WFG.

¶21    Here, it is undisputed that Commitment Schedule B and Policy Schedule B contain identically worded Easement Exceptions.  Accordingly, we reject the Coxes' argument that, because they did not timely receive the Policy, they were unaware that their contract excepts coverage for disputes relating to this easement.  The case law upon which the Coxes rely for this proposition is distinguishable because that authority concerns the insured's lack of notice of policy terms.  For example, in ***Kozlik v. Gulf Insurance Co.***, 2003 WI App 251, ¶¶12-17, 268 Wis. 2d 491, 673 N.W.2d 343, we concluded that an insurer was estopped from enforcing an exclusion in a policy for personal accident insurance, where the insured did not receive a copy of the policy or a summary of its terms when he rented the

---

[10]  By its terms, the Commitment *does* create some potential liability on WFG's part, but limited to specified types of actual losses—not at issue here—that the insured reasonably incurs in reliance on the Commitment before the Policy is issued.

[11]  The 2006 ALTA commitment contains two Schedules B (Schedule B-1 and B-2). Schedule B-1 (not at issue here) sets forth the requirements and conditions that the prospective insured must fulfill before the insurer issues the final policy.  NIELSEN, TITLE ESCROW CLAIMS GUIDE § 6.1 (2021 ed.).  Schedule B-2 sets forth exceptions to coverage.  ***Id.***  For ease of reading, we use the term "Schedule B" to refer to Schedule B-2 of this Commitment.

car. Our decision hinged on the circuit court's determination that the insured "did not have notice of the terms and conditions contained in the … rental agreement." *Id.*, ¶11. We recognized that the insured was a repeat customer of the car rental agency; however, the rental agreement "was an independent contract—and although unlikely, it was possible that the terms of the insurance policy had changed." *Id.*, ¶16. Here, the Coxes' Commitment is not the equivalent of a prior independent contract with WFG—it is an offer to issue the Policy the Coxes actually received, containing the very exceptions WFG now relies on to except coverage.[12]

¶22    In seeking to avoid this conclusion, the Coxes argue that Commitment Schedule B and Policy Schedule B are not, in fact, identical. The Coxes point out, for example, that Commitment Schedule B contains four more exceptions than Policy Schedule B. It follows, the Coxes argue, that the Commitment could not provide notice of which exceptions would be contained within the Policy because the Commitment exceptions were "not set in stone."

¶23    As should be evident from our discussion of title insurance, this argument is meritless. A commitment and a policy are not required to be identical: they are separate contracts and confer separate and distinct contractual rights on the insured. Specifically, Schedule B of this Commitment sets forth all

---

[12] The additional authority the Coxes rely on in support of this argument is inapposite. *See, e.g.*, *Gross v. Lloyds of London Ins. Co.*, 121 Wis. 2d 78, 87-89, 358 N.W.2d 266 (1984); *Roeske v. Diefenbach*, 75 Wis. 2d 253, 260-61 & n.2, 249 N.W.2d 555 (1977); *Heezen v. Hartland Cicero Mut. Ins. Co.*, 63 Wis. 2d 449, 453-54, 217 N.W.2d 272 (1974). Like *Kozlik v. Gulf Insurance Co.*, 2003 WI App 251, ¶¶12-17, 268 Wis. 2d 491, 673 N.W.2d 343, each of these cases supports the proposition that a prospective insured must have notice of the terms of the policy, without supporting the Coxes' separate argument that their Commitment did not provide such notice. In fact, one of these cases, *Gross*, supports our conclusion here. In holding that the insurer could not deny coverage because of the insured's lack of notice of a policy limitation, the *Gross* court relied, in part, on the fact that "the binder was silent concerning [the insurer's] obligation to defend." *Gross*, 121 Wis. 2d at 88. Here, in contrast, the Coxes' Commitment sets forth the operative exceptions to coverage.

the exceptions that *will* be contained in the Policy *unless* they "are disposed of to the satisfaction of" WFG. Of course, an insurer cannot add additional exceptions to a policy that are not contained in the commitment—but this is not the Coxes' argument. *See* JOYCE PALOMAR, 1 TITLE INSURANCE LAW § 7.1 (2021 ed.) ("Once an insured has accepted the insurer's offer and met the commitment's requirements … the insurer should not be able to change its offer or add new exceptions to the policy's coverage."). In sum, the fact that certain exceptions were "disposed of" to WFG's "satisfaction"—and, accordingly, omitted from the Policy—has no bearing on WFG's contractual right to preclude coverage based on exceptions contained in *both* the Commitment *and* the Policy.

¶24 The Coxes further point out that Schedule B of the Policy expressly sets forth the legal effect of the Easement Exceptions: that "this Policy does not insure against loss or damage, and [WFG] will not pay costs, attorneys' fees or expenses that arise by reason of: [lists exceptions]." In contrast, Schedule B of the Commitment states, "Schedule B of the Policy … to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of [WFG]: [lists exceptions]." According to the Coxes, the Commitment's failure to mimic the terms of the Policy means that "a reasonable person in [their] position … would not have been put on notice and understood [Commitment Schedule B] to bar coverage."

¶25 We disagree. The Commitment states that WFG commits to issuing the Policy "subject to the provisions of" Schedule B. The Commitment also informs the Coxes that any policy eventually issued will control (i.e., "[WFG's] liability and obligation under this Commitment shall cease and terminate ninety (90) days after the effective date [of the Commitment] or when the Policy … committed for shall issue, whichever first occurs"). Moreover, the Commitment states that WFG "will

12

provide a sample of the Policy form upon request." The Policy, in turn, informs the insured that liability is limited to the Policy; it also notifies the insured that the Schedule B exceptions operate to preclude coverage. Thus, on receiving the Commitment, the Coxes were provided information from which they could reasonably ascertain that the Policy would not provide coverage for those matters excepted under Commitment Schedule B. WFG had no additional obligation to explain the legal effect of the Policy exceptions.

¶26     Aside from the notice issue, the Coxes identify three reasons why the late issuance of the Policy should preclude WFG from relying on the Policy exceptions. First, the Coxes imply that WFG cannot rely on any Policy exceptions because it made arguments before the circuit court that it later abandoned or contradicted. For example, WFG's answer asserted that there was no breach of contract because WFG never issued a policy; then, three months later, WFG issued the Policy. The Coxes have not shown, however, why WFG's changing its position during the litigation might preclude it from denying coverage under the terms of the Policy. Accordingly, we do not address their argument further. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we may decline to review issues inadequately briefed).

¶27     Second, the Coxes argue that WFG breached either the Commitment or the Policy by not timely issuing the Policy. This argument is difficult to follow, as it is unclear which contractual language (and which contract) the Coxes rely on to support this conclusion. Along similar lines, the Coxes argue that WFG failed to comply with WIS. STAT. § 631.05, requiring insurers to "issue a policy as soon as reasonably possible after issuance of any binder." Thus, the Coxes' larger argument seems to be that the mere "[f]ailure to [timely] supply a policy forfeits coverage defenses."

13

¶28 To support this point, the Coxes reference legal authority concerning the insurer's notice defense, asking us to conclude that, "[j]ust as [the insured's] failure to provide timely notice [of the claim] breaches an insurance contract and negates coverage, the unfulfilled obligation to issue a policy [pursuant to WIS. STAT. § 631.05] only appropriately negates policy defenses." *See, e.g.*, *Neff v. Pierzina*, 2001 WI 95, ¶¶29-32, 245 Wis. 2d 285, 629 N.W.2d 177 (discussing the insurer's notice defense). Aside from citing this inapposite case law, however, the Coxes provide no legal authority for their assumption that this court may "negate WFG's policy defenses" because WFG did not timely issue the Policy. In the absence of such authority, it is within the purview of the legislature, not this court, to create the Coxes' desired remedy for an insurer's alleged failure to comply with § 631.05. We therefore reject this argument.

¶29 Finally, the Coxes imply that WFG may not rely on the Easement Exceptions because it engaged in misconduct by "fabricating" or wrongfully backdating the Policy. Again, the Coxes do not cite any authority permitting us to impose this remedy on WFG. Nor do the Coxes point to any evidence in the record supporting their assertion that WFG engaged in misconduct. Although WFG issued the Policy in April 2020, the Policy's effective date is January 23, 2017—the same date on which the Coxes recorded their deed. As WFG explains, and the record reflects, the Policy therefore "properly provided … coverage from the date that the Coxes' deed was recorded forward." Thus, WFG assigned an effective date to the Policy not to "fabricat[e]" a policy but to begin coverage on the proper date.

¶30 We conclude that, under the circumstances of this case, WFG's issuing the Policy after the Coxes' lawsuit—while not a favored practice—does not prohibit WFG from denying coverage per the Policy's terms. We turn now to whether the Easement Exceptions preclude coverage for this dispute.

## II. The Easement Exceptions Preclude Coverage for the Columb/Cox Lawsuit.

¶31 The Coxes argue that the Policy covers this dispute and that no exclusions or exceptions preclude coverage. WFG disagrees that there is an initial grant of coverage under Covered Risk 2; it further argues that various exclusions and exceptions apply. For the following reasons, we conclude that the Easement Exceptions preclude coverage for this dispute. Accordingly, we assume without deciding that there is an initial grant of coverage under the Policy, and we do not address whether other Policy provisions might also preclude coverage. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

¶32 As stated, the Easement Exceptions in Policy Schedule B are as follows:

> This policy does not insure against loss or damage, and [WFG] will not pay costs, attorneys' fees or expenses that arise by reason of:
>
> ….
>
> 8. Rights and/or claims of others in and to that ingress/egress easement as set forth in [DeGroff Deeds 1-4] *and as modified* in [the Modification]. (Easements benefit several parcels located adjoining or near to the insured premises.)
>
> 9. Terms and provisions as to use and maintenance of that ingress/egress easement as set forth in [DeGroff Deeds 1-4] *and as modified* in [the Modification]. (Easements benefit several parcels located adjoining or near to the insured premises.)

15

(Emphasis added.) The Coxes' central argument is that these exceptions only refer to a single easement: the Modified Easement. It follows, in their view, that coverage is *not* excepted for any losses or disputes relating to the Original Easement.

¶33 This argument attaches an improper significance to the Easement Exceptions' use of the phrase "and as modified." A title insurance policy is an indemnity contract, not a warranty that title is as described. *See Greenberg*, 171 Wis. 2d at 493-94 ("[T]he insurer does *not* represent expressly or impliedly that the title is as set forth in the policy; it merely agrees that … the insurer will pay for any losses resulting from, or he will cause the removal of, a cloud on the insured's title within the policy provisions." (alterations in original; citation omitted)). Thus, Schedule B's reference to "that ingress/egress easement as set forth in [DeGroff Deeds 1-4] and as modified in [the Modification]" is *not* a representation that the Original Easement was (or was not) validly modified or that coverage would be excepted only for an easement in some specific modified location. *See id.*

¶34 Rather, in issuing the Policy, WFG determined which records were associated with "that ingress/egress easement" (namely, the four DeGroff Deeds and the Modification), and it listed those instruments where pertinent, including in the Easement Exceptions. *See* PALOMAR, 1 TITLE INSURANCE LAW § 1.15 (before issuing the policy, the title insurer "performs a search of the real property records pertaining to the interest to be insured"; "[i]f this search uncovers any encumbrances or title defects, the title insurer initially writes those not already excluded from the policy as exceptions to any policy to be issued, and in this way discloses them to the applicant"). In this way, WFG notified the Coxes of which title defect or encumbrance was being excepted.

16

¶35    Thus, by their plain terms, the Easement Exceptions preclude coverage for an identified easement—"that ingress/egress easement"—and provide the Coxes with the additional information they need to determine the title defect or encumbrance these exceptions are meant to reference. This is the only purpose and effect of the Policy's listing all of the recorded instruments relating to this easement. It may very well be that one of these instruments—the Modification—is invalid, but this is a separate issue unrelated to whether the Easement Exceptions have adequately provided notice of the terms of coverage. In short, the phrase "and as modified" does not substantively limit the scope of the Easement Exceptions in the manner the Coxes suggest. Rather, the Policy excepts coverage for "that ingress/egress easement" regardless of which path is ultimately determined to be enforceable.

¶36    Moreover, even assuming that the Easement Exceptions could be construed to except coverage for only certain types of disputes (i.e., disputes relating to the easement in its modified location), WFG still would not owe coverage. We have used the terms "Original Easement" and "Modified Easement" for ease of reading, but of course, there is only a single easement in one location or the other. This is not, as the Coxes suggest, a dispute about an Original Easement that is wholly unrelated to any dispute about a second easement (the Modified Easement). Thus, the underlying merits—the exact path this easement runs over the Coxes' property—is in fact a dispute about the easement in *both* its original and modified

17

locations. Accordingly, even if we accepted the Coxes' desired interpretation of the Easement Exceptions, we would still conclude that this dispute is excepted.[13]

¶37 The Coxes also attempt to shoehorn their negligence claims against Bay Title and Fifarek into our contractual analysis. Recall that Bay Title, acting as WFG's agent, issued the Coxes' policy and that Fifarek, Bay Title's employee, also drafted the Modification for the Putirskises. The Coxes have alleged that Fifarek drafted the Modification without a signature line for the Columbs, which caused the

---

[13] The Coxes' overarching argument is that the Easement Exceptions "clearly" except coverage only for those losses or disputes relating to the Modified Easement. Nonetheless, the Coxes repeatedly refer to ambiguity in the Policy. It is difficult to follow these arguments, but for the sake of completeness, we will attempt to address them here.

First, the Coxes attach significance to the fact that the description of the property in Schedule A states that the property is subject to "that ingress/egress easement set forth in [DeGroff Deed 1], *as modified* in [the Modification]," whereas the Easement Exceptions in Schedule B except coverage for "that ingress/egress easement as set forth in [DeGroff Deeds 1-4] *and as modified* in [the Modification]." (Emphases added.) The Coxes do not explain why the omission of the word "and" in the Schedule A description of the easement creates ambiguity in the Schedule B Easement Exceptions.

Second, the Coxes imply that Schedule A is ambiguous because it "should have identified all of the easements." But there is only one recorded easement on the Coxes' property; thus, the Coxes apparently mean to argue that Schedule A should have identified the additional DeGroff Deeds (Deeds 2-4) conveying or reserving the Original Easement. Because Schedule A is a description of the land to which the title insurance pertains, however, we do not discern why Schedule A needed to include information about DeGroff Deeds 2-4, which relate to the easement established by DeGroff Deed 1.

Finally, the Coxes point out that "there were more parcels with easement rights over the Original Easement … than contained in the Modification." The Coxes may be trying to point out that, per DeGroff Deed 4, the Original Easement benefits two parcels in addition to the Columbs' parcel. The Coxes do not explain why this fact causes or pertains to ambiguity in the Easement Exceptions.

Because these three arguments are inadequately briefed, we note them without addressing them further. *See **Pettit**,* 171 Wis. 2d at 646.

Putirskises to record a Modification without legal effect.[14] It is somewhat difficult to follow the Coxes' arguments on how the actions of Bay Title and Fifarek pertain to our policy analysis. Broadly speaking, however, our role in policy interpretation is not to determine whether or why the Modification is invalid but to discern the meaning of the Easement Exceptions. The fact that the Easement Exceptions reference recorded instruments, including the Modification, does not mean that Bay Title's or Fifarek's actions in regard to the Modification are relevant to our coverage analysis.

¶38    Finally, we must address a separate argument regarding the wording of the Easement Exceptions. Throughout this decision, we have discussed the Easement Exceptions as referencing the Modification. In fact, through a mistake on WFG's part, the Easement Exceptions reference the wrong document. Specifically, the Easement Exceptions state that the "ingress/egress easement" is "as modified in Doc. No. 810096." The Modification, however, was recorded as document number 810094. In his deposition, Fifarek described this single-digit difference as a "scrivener's error." The parties agree that the Easement Exceptions should have referenced document number 810094 and that document number 810096 is unrelated to the Coxes' parcel.

¶39    The Coxes argue that we "should deem that th[is] unilateral mistake nullifies the exceptions." The Coxes cite to no law holding that an error of this type, standing alone, allows a court to "nullify" a policy exception. Moreover, and

---

[14] It is undisputed that Bay Title, as WFG's agent, issued the Coxes' title policy; however, the parties dispute whether Bay Title and Fifarek were also acting as WFG's agents when Fifarek drafted the Modification for the Putirskises. We do not decide this issue because it is irrelevant to our analysis of the Easement Exceptions.

significantly, the Coxes do not argue that this mistake actually caused them to be unaware of the terms of coverage (i.e., that they were unclear about which title defect or encumbrance was being excepted). We therefore do not address this argument further. *See Pettit*, 171 Wis. 2d at 646.[15]

## CONCLUSION

¶40 WFG's delay in issuing the Policy does not preclude it from denying coverage per the Policy's terms. Furthermore, by operation of the Easement Exceptions, the Policy does not require WFG to defend or indemnify the Coxes in their suit with the Columbs. Accordingly, we affirm the circuit court order granting summary judgment to WFG, dismissing the Coxes' breach of contract claim against WFG, and dismissing WFG from this lawsuit.[16]

*By the Court.*—Order affirmed.

---

[15] The Coxes cite *Clark v. Moru*, 19 Wis. 2d 503, 506, 120 N.W.2d 888 (1963), for the proposition that this is not a situation where a contract can be reformed because of mutual mistake. *See id.* ("In order to reform a contract on the ground of mistake, the general rule is that the mistake must be mutual, or mistake on one side and fraud on the other." (citation omitted)). As WFG rightly points out, however, WFG is not attempting to reform the Policy; it is merely seeking to apply the Policy's terms.

[16] The Coxes argue that WFG's summary judgment motion is "procedurally deficient" because WFG did not provide "evidence about the facts underlying this suit—how or why the Coxes blocked the easement." But the duty to defend is broader than, and encompasses, the duty to indemnify, in that the duty to defend implicates arguable and not actual coverage. *Estate of Sustache v. American Fam. Mut. Ins. Co.*, 2008 WI 87, ¶20, 311 Wis. 2d 548, 751 N.W.2d 845; *Great Lakes Beverages, LLC v. Wochinski*, 2017 WI App 13, ¶15, 373 Wis. 2d 649, 892 N.W.2d 333. Accordingly, it was not "procedurally deficient" for WFG to rely on the terms of the Policy to argue that it had no duty to defend the Coxes (and, accordingly, no duty to indemnify the Coxes should they later be found liable for intentional interference with the easement).